[Cite as *Amesse v. Wright State Physicians, Inc.*, 2018-Ohio-416.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| DR. LAWRENCE AMESSE, M.D., Ph.D., | : | C.A. CASE NO.   27370 |
|  | : |  |
|  | : | T.C. NO. 2015-CV-68 |
| Plaintiff-Appellee | : |  |
|  | : |  |
| v. | : |  |
|  | : | (Civil Appeal from |
| WRIGHT STATE PHYSICIANS, INC., et al. | : | Common Pleas Court) |
|  | : |  |
| Defendants-Appellants | : |  |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 2nd day of February, 2018.

. . . . . . . . . .

JONATHAN HOLLINGSWORTH, Atty. Reg. No. 0022976, Hollingsworth & Washington, LLC, 6494 Centerville Business Parkway, Centerville, Ohio 415459
        Attorney for Defendants-Appellants

MARC D. MEZIBOV, Atty. Reg. No. 0019316, and SUSAN L. BUTLER, Atty. Reg. No. 0082811, Mezibov Butler, 615 Elsinore Place, Suite 105, Cincinnati, Ohio 45202
        Attorneys for Plaintiff-Appellee

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Wright State Physicians, Inc. (hereinafter "WSP"), and

defendants-appellants Margaret Dunn, M.D., and Jerome Yaklic, M.D., appeal a judgment, pursuant to jury verdict, of the Montgomery County Court of Common Pleas in favor of plaintiff-appellee Lawrence Amesse, M.D., Ph.D., on his claims for breach of contract, employment discrimination, and retaliation. Appellants filed a timely notice of appeal with this Court on December 2, 2016.

## I. Facts and Procedural History

{¶ 2} From 1998 until 2013, Dr. Amesse was employed by WSP as a physician and by Wright State University's Boonshoft School of Medicine (hereinafter "BSOM") as a professor of obstetrics and gynecology. WSP is a physician-managed multi-specialty practice. During the course of his employment at WSP and BSOM, Dr. Amesse was promoted to associate professor, and then full professor at BSOM. Dr. Amesse also later became director of WSP's Andrology Laboratory, Director of Reproductive Endocrinology and Infertility (hereinafter "REI") Division, and Clerkship Director for BSOM's medical students.

{¶ 3} Similar to Dr. Amesse, both Drs. Dunn and Yaklic were employees of WSP and BSOM. At all relevant times, Dr. Dunn was the Chief Executive Officer and President of WSP. Dr. Dunn was also the Executive Associate Dean at BSOM. Dr. Yaklic was the Acting Chair of Obstetrics and Gynecology at WSP and BSOM.

{¶ 4} In January of 2011, Dr. Amesse was called to attend a meeting with Dr. Yaklic and Dr. Ventolini, another physician-employee of WSP and BSOM. During the meeting on January 25, 2011, Dr. Amesse was informed that WSP had received a complaint alleging that he had harassed Cindy Gnau, a WSP employee who worked with Dr. Amesse in the REI Division. Thereafter, at another meeting on February 7, 2011, Dr.

Amesse was informed that WSP's investigation had revealed other complaints regarding his behavior towards Gnau. As result of its investigation, WSP reassigned Gnau to another section of the office with which Dr. Amesse was not involved. WSP also requested that Dr. Amesse not have any further contact with Gnau.

**{¶ 5}** Notwithstanding its request, WSP received reports that Dr. Amesse was still having contact with Gnau in the office. WSP also alleged that it received complaints that Dr. Amesse acted inappropriately and unprofessionally towards other staff in the office. Specifically, WSP alleged that Dr. Amesse yelled at staff about vacation scheduling, took staff to lunch despite being asked not to do so by management, provided soft drinks to WSP staff from the Miami Valley Hospital physician's lounge after being informed this violated hospital rules, loitered with staff while patients waited for him, and "consistently" arrived late for work.

**{¶ 6}** WSP officials also asserted that Dr. Amesse acted unprofessionally by shouting and playing loud music in his office while patients were present. WSP alleged that it had received complaints from two patients that Dr. Amesse "appeared confused" while treating them in the medical office. Evidence was also adduced that Erin Yontz, a former WSP employee, had resigned specifically because of Dr. Amesse's negative conduct towards her.

**{¶ 7}** Based upon the allegations of inappropriate and unprofessional conduct, Dr. Yaklic and Dr. Albert Painter, another WSP employee and BSOM administrator, asked Dr. Amesse to attend a meeting on August 15, 2011. During the meeting, Dr. Yaklic informed Dr. Amesse of the several complaints and allegations regarding his conduct at work. As a result of his behavior, WSP ordered Dr. Amesse to attend a fitness-for-duty

examination conducted by Dr. Melvyn Nizny of the Psychoanalytic Institute.

{¶ 8} Initially, Dr. Amesse agreed to submit to the psychological evaluation, and the examination was scheduled to be conducted on August 29, 2011. Shortly thereafter, Dr. Amesse had a change of heart and cancelled his appointment with Dr. Nizny. As a result, Dr. Yaklic informed Dr. Amesse that he was suspended from WSP, and therefore not permitted to treat any patients in the WSP private offices until he submitted to the fitness-for-duty examination. Dr. Amesse was still permitted to treat his own private patients as well as attend to his duties supervising medical students and staff at BSOM.

{¶ 9} Dr. Amesse relented, and on September 2, 2011, he met with Dr. Nizny for the fitness-for-duty examination. On September 9, 2011, counsel for Dr. Amesse sent a letter to WSP indicating a concern that Dr. Amesse's rights pursuant to the Americans With Disabilities Act (hereinafter "ADA") were being violated by the suspension. WSP did not respond to the letter. Thereafter, on September 27, 2011, Dr. Amesse met with Janet D. Castellini, a licensed psychologist, for further testing. On October 4, 2011, Dr. Amesse's counsel sent a second letter to WSP in which he reiterated his concern that the suspension violated Dr. Amesse's rights under the ADA. Again, WSP did not respond to the letter.

{¶ 10} Dr. Amesse's fitness-for-duty examination was eventually completed by the end of October of 2011. On November 15, 2011, Dr. Nizny issued a report to WSP advising that Dr. Amesse was fit for duty, provided that he received counseling for at least six months. WSP lifted the suspension, and Dr. Amesse returned to work on November 17, 2011.

{¶ 11} On May 14, 2012, Dr. Yaklic and Dr. Dunn informed Dr. Amesse that he

would be required to reimburse WSP for a financial deficit of $107,222.00 accrued between the months of July 1, 2011 and March 30, 2012. Approximately $76,537.00 of that amount was attributed to the period during which Dr. Amesse was suspended from treating patients in the WSP private office pending the outcome of his fitness-for-duty examination. Dr. Amesse was also informed that he would no longer be receiving a WSP salary beginning in June of 2012 in order to cover the financial deficit created by his department.

{¶ 12} During this period, WSP held additional meetings with Dr. Amesse in order to discuss performance and conduct related matters regarding his non-compliance with office procedures involving the andrology laboratory's certification and WSP's chaperone policy. WSP also informed Dr. Amesse of complaints regarding his alleged failure to utilize the appropriate e-mail addresses for medical personnel; authorizing free care for patients; not appropriately documenting patient encounters; and violating chain of command within the office. During a meeting in August of 2012, Dr. Amesse was informed by WSP that "[a]ny further contact with private office staff outside of normal business and official department activities would be grounds for immediate suspension from all patient care activities in the private office."

{¶ 13} After August of 2012, WSP stated that it became aware of additional complaints about Dr. Amesse's allegedly inappropriate work behavior, to wit: failure to use proper hand washing techniques when performing an ultrasound on a female patient; discussing personal financial information with resident physicians; keeping patient information on a laptop computer which did not have an encrypted hard drive; and instructing WSP staff to schedule surgeries at Children's Medical Center. Dr. Amesse

was also accused of improperly calling in prescriptions for patients who were not treated at WSP private offices.

**{¶ 14}** Based upon the new allegations of inappropriate and unprofessional conduct, on December 12, 2012, Drs. Dunn and Yaklic placed Dr. Amesse on administrative leave.  After Dr. Amesse was suspended for a second time, WSP retained Dr. Bruce Carr, M.D., in order to evaluate his professional ability.  Using medical and financial documents selected by WSP from the last six months of Dr. Amesse's practice, Dr. Carr created a report that he provided to WSP on January 13, 2013.  In his report, Dr. Carr was highly critical of every aspect of Dr. Amesse's practice of medicine.  Dr. Carr also called into question Dr. Amesse's "basic understanding of medical and reproductive endocrinology."  Thereafter, on January 25, 2013, Dr. Dunn met with Dr. Amesse and provided him with a letter stating that his employment with WSP would be terminated effective as of April 30, 2013.  On February 22, 2013, Dr. Amesse received a letter from the Dean of BSOM informing him that he was being dismissed from his faculty position.

**{¶ 15}** On January 6, 2015, Dr. Amesse filed a complaint against WSP, Dr. Dunn, and Dr. Yaklic in which he asserted claims for breach of contract, employment discrimination, and retaliation.[1]  The defendants filed an answer to Dr. Amesse's complaint on February 6, 2015.

**{¶ 16}** After extensive motion practice by both parties, the case proceeded to a jury trial which began on May 2, 2016, and concluded on May 17, 2016.  During trial, all

---

[1] The record establishes that Dr. Amesse originally filed a complaint against WSP, Dr. Dunn, and Dr. Yaklic on June 3, 2013.  However, in November of 2014, Dr. Amesse voluntarily dismissed his complaint.

of the defendants moved for a directed verdict with respect to each of Dr. Amesse's claims. The trial court denied the motions for directed verdict. At the conclusion of the trial, the jury returned verdicts in favor of Dr. Amesse on all of his claims, except one verdict on the discrimination complaint against Dr. Yaklic. For his breach of contract claim against WSP, Dr. Amesse was awarded $109,996.00 in economic damages. For his discrimination claim against WSP, Dr. Amesse was awarded $85,000.00 in economic damages. For his discrimination claim against Dr. Dunn, Dr. Amesse was awarded $500.00 in economic damages. For his retaliation claim against WSP, Dr. Amesse was awarded $85,000.00 in economic damages. For his retaliation claim against Dr. Dunn, Dr. Amesse was awarded $7,500.00 in economic damages.

{¶ 17} On May 26, 2016, the defendants filed a motion for judgment notwithstanding the verdict (JNOV). On November 3, 2016, the trial court issued a decision overruling the defendants' motion for JNOV.

{¶ 18} It is from this judgment that defendant-appellants WSP, Dr. Dunn, and Dr. Yaklic now appeal.

{¶ 19} Defendant-appellants' first assignment of error is as follows:

{¶ 20} "THE TRIAL COURT ERRED BY ADMITTING INTO EVIDENCE TWO LETTERS FROM PLAINTFF'S COUNSEL TO DEFENDANT WSP IN WHICH PLAINTIFF'S COUNSEL SET FORTH HIS PERSONAL LEGAL OPINIONS AND CONCLUSIONS."

{¶ 21} In their first assignment of error, appellants argue that the trial court abused its discretion when it admitted Plaintiff's Exhibits 29 and 36 into evidence during trial. Pl.'s Exs. 29 and 36 consist of two letters written by Dr. Amesse's trial counsel to WSP

on September 9, 2011, and October 4, 2011. Both letters contain counsel's assertion that WSP's requirement that Dr. Amesse undergo a fitness-for-duty examination potentially violated the Americans with Disabilities Act (ADA) which "makes it unlawful for a covered entity to require a medical examination of an employee." Pl. Ex. 29. Specifically, WSP argues that the trial court erred when it admitted the contents of counsel's letters because the legal conclusions and opinions of Dr. Amesse's counsel contained in the letters were irrelevant and contrary to the existing and controlling law, constituted inadmissible hearsay, and were unfairly prejudicial to appellants despite the limiting instruction.

{¶ 22} " 'The admission or exclusion of relevant evidence rests within the sound discretion of the trial court.' *State v. Sage,* 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987)." *State v. Williams*, 2d Dist. Montgomery No. 26369, 2016–Ohio–322, ¶ 17. "A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable. *State v. Renner,* 2d Dist. Montgomery No. 25514, 2013–Ohio–5463, ¶ 24." *Id.* "The Supreme Court of Ohio has defined 'abuse of discretion' as an 'unreasonable, arbitrary, or unconscionable use of discretion, or as a view or action that no conscientious judge could honestly have taken.' *State v. Kirkland*, 140 Ohio St.3d 73, 2014–Ohio–1966, 15 N.E.3d 818, ¶ 67." *Id.*

{¶ 23} Initially, we note that Dr. Amesse's complaint asserted a claim for retaliation under R.C. 4112.02. R.C. 4112.02(I) provides that it is an unlawful discriminatory practice "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, * * * or participated in any manner" in any R.C.

Chapter 4112 "investigation, proceeding, or hearing." "[T]o prevail on a retaliation claim, a plaintiff must show that retaliation is a determinative factor—not just a motivating factor—in the employer's decision to take adverse employment action." *Nebozuk v. Abercrombie & Fitch Co.,* 10th Dist. Franklin No. 13AP-591, 2014-Ohio-1600, ¶ 45. *See also Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013).

{¶ 24} In retaliation claims under Title VII, 42 U.S.C. 2000e–3(a), which is analogous to R.C. 4112.02(I), the analysis is whether the protected conduct was a determinative factor in the retaliatory conduct; in other types of discrimination claims, the standard is whether the protected conduct or classification was a "motivating factor" in an adverse employment action. *Nebozuk* at ¶ 45, citing *Smith v. Ohio Dept. of Pub. Safety*, 2013-Ohio-4210, 997 N.E.2d 597, ¶ 59 (10th Dist.).

{¶ 25} Under the *McDonnell Douglas* framework, a plaintiff-employee bears the initial burden of establishing a prima facie case of retaliation. *Nebozuk* at ¶ 40, citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a prima facie case of retaliation under R.C. 4112.02(I), an employee must establish the following: (1) he engaged in protected activity; (2) WSP knew of his participation in protected activity; (3) WSP engaged in retaliatory conduct; and (4) a causal link existed between the protected activity and the adverse action. *Nebozuk* at ¶ 40. The establishment of a prima facie case creates a presumption that the employer-defendant unlawfully retaliated against the employee-plaintiff. *Id.*

## A. Irrelevant and Contrary to Law

**{¶ 26}** Appellants first argue that the letters were improperly admitted because the record established that Dr. Amesse was suspended on August 29, 2011, eleven days prior to the date the letter was created and sent to WSP. While it is true that the first letter was sent to WSP *after* the first suspension, Dr. Amesse did not argue that his suspension was proximately caused by the letters being sent to WSP. In fact, Dr. Amesse never alleged that his first suspension on August 29, 2011, was in any way related to his retaliation claim.

**{¶ 27}** Rather, Dr. Amesse argued that WSP's decision to modify his salary and/or terminate his employment was unlawfully motivated by consideration of the contents of the letters drafted by his counsel. Dr. Amesse's argument in this regard is mirrored in the following jury instruction and interrogatories provided to the jury:

Dr. Amesse must establish that there was a causal connection between his engaging in protected activity and the adverse employment actions of modifying his salary and/or termination of his employment.

Interrogatory E-1: Do you find Dr. Amesse established by a preponderance of the evidence that Wright State Physicians, Inc. retaliated against him by modifying his salary as reflected in Defendant's Exhibit 54?

Interrogatory E-2: Do you find Dr. Amesse established by a preponderance of the evidence that Wright State Physicians, Inc. retaliated against him by

terminating his employment?

In light of the foregoing, it is apparent that the date of Dr. Amesse's first suspension on August 29, 2011, did not foreclose proper consideration of the letters bearing upon his claim for retaliation against WSP. Undoubtedly, the salary modification and termination occurred after the letters were sent. However, Dr. Amesse certainly was permitted to assert that the consequences of the suspension were related to his protected activity, a suspension he concluded was contrary to law. Furthermore, as emphasized by the trial court, it is clear Dr. Amesse harbored some objection to the examination as he subsequently obtained legal counsel, questioning its legitimacy.

{¶ 28} Appellants also argue that the letters are irrelevant because neither letter contains any reference to Chapter 4112.02, Ohio's anti-discrimination law. Rather, appellants contend that because the letters only mention a potential violation of the ADA, the letters could not constitute evidence that Dr. Amesse "opposed an unlawful discriminatory practice defined in [R.C.] 4112.02." Therefore, appellants assert that the letters were not probative of Dr. Amesse's claim for retaliation and should not have been admitted into evidence.

{¶ 29} We can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law. *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 573, 697 N.E.2d 204 (1998). In *Pflanz v. Cincinnati*, 149 Ohio App.3d 743, 2002 -Ohio- 5492, 778 N.E.2d 1073 (1st Dist.), the court held that the test for establishing a claim of retaliation under federal law is basically the same one that is applied to a plaintiff's state retaliation claim. *Id*. at ¶ 63. Specifically, in order to establish his retaliation claim under the ADA and R.C. 4112.02(I), a plaintiff has to show that (1) he

engaged in protected activity; (2) his employer knew about the protected activity; (3) the employer took an adverse action; and (4) there was a causal connection between the protected activity and the adverse action. *Id.* at ¶ 64; *see Canitia v. Yellow Freight*, 903 F.2d 1064, 1066 (C.A.6, 1990). The tests to establish retaliation under the ADA and R.C. 4112.02(I) are virtually identical.

{¶ 30} In the two letters, Dr. Amesse's counsel specifically states that WSP's actions may have constituted a violation of the ADA, the federal anti-discrimination statute after which Ohio's anti-discrimination statute is modeled. The test for employer retaliation is basically the same in the federal and state version of the statute. Furthermore, the Ohio Supreme Court has stated that "R.C. 4112 is remedial legislation" that "shall be construed liberally for the accomplishment of its purposes." *Dworning v. Euclid*, 119 Ohio St.3d 83, 2008-Ohio-3318, 892 N.E.2d 420, ¶ 27; R.C. 4112.08. Construed liberally, we find that by stating in the letters that WSP's actions potentially violated the ADA, counsel was essentially arguing that Dr. Amesse was opposing WSP's discriminatory practices as set forth in R.C. 4112.02(I). Accordingly, the letters drafted by counsel and their contents constitute protected activity for the purposes of a claim for retaliation pursuant to R.C. 4112.02(I).

**B. Hearsay**

{¶ 31} Next, appellants contend that the letters constitute inadmissible hearsay because they were considered by the jury for the truth of the matter asserted. In other words, appellants argue that the jury accepted Dr. Amesse's counsel's conclusions in the letters as statements of fact, namely that WSP violated the ADA.

**{¶ 32}** " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). However, a statement is not hearsay when offered for a purpose other than to prove the truth of the matter asserted, e.g., to show its effect on the listener. *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 118, 122, citing *State v. Davis*, 62 Ohio St.3d 326, 343, 581 N.E.2d 1362 (1991).

**{¶ 33}** In the instant case, Dr. Amesse did not request to have the letters admitted into evidence in order to establish that the fitness-for-duty examination request violated the ADA and/or Ohio's anti-discrimination laws. Rather, Dr. Amesse sought to have the letters admitted in order to show the effect they had on the appellants, namely that the letters triggered WSP's retaliatory decisions to modify Dr. Amesse's salary and/or terminate his employment. Further, after defense counsel objected to these statements as hearsay, Dr. Amesse's counsel explained that these statements were not being offered for the truth of the matter asserted, prompting the trial court to issue a limiting instruction to the jurors that explained the purpose of these statements. The limiting instruction provided by the trial court is as follows:

> Members of the jury, with regard to this exhibit, Plaintiff's Exhibit 29, when it is projected on the screen on the first page of that exhibit, that letter, which is a letter to Dr. Dunn from Mr. Mezibov [Dr. Amesse's counsel], the paragraph as you'll see makes reference to opinions by Mr. Mezibov as to the Americans with Disabilities Act, the ADA Act [sic] and so with regard to that paragraph the Court gives the following limiting instruction.
>
> *The opinion of the attorney in that letter, in that paragraph as to the*

*law of the ADA is not binding upon you, the jury, and you are not to conclude*

*based upon the statements in that letter, in that paragraph that this is a*

*correct statement of the ADA law.* \*\*\*

Tr. Vol. II at 473.

{¶ 34} On the record before us, it is clear that the letters sent by Dr. Amesse's counsel to WSP were not inadmissible hearsay because they were only admitted into evidence to establish the effect they had on the appellants, i.e., the letters triggered WSP's retaliatory decisions to modify Dr. Amesse's salary and/or terminate his employment.

### C. Probative Value of the Letters v. their Prejudicial Effect

{¶ 35} The appellants also argue that the probative value of Pl.'s Exs. 29 and 36 is outweighed by the prejudicial effect that the letters had on the jury. Specifically, the appellants contend that the letters should have been excluded from evidence because "the jury likely gave substantial weight to the statements by Dr. Amesse's counsel regarding a potential violation of the law because of the mere fact he is an attorney and consequently presumed by the jury to be an expert on the subject."

{¶ 36} Evid.R. 403(A) provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *Id.* This rule "manifests a definite bias in favor of the admission of relevant evidence, as the dangers associated with the potentially inflammatory nature of the evidence must substantially outweigh its probative value before the court should reject its admission." *State v. White*, 4th Dist. Scioto No.

03CA 2926, 2004-Ohio-6005, ¶ 50. Thus, "[w]hen determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent, maximizing its probative value and minimizing any prejudicial effect to the party opposing admission." *State v. Lakes*, 2d Dist. Montgomery No. 21490, 2007-Ohio-325, ¶ 22. In addition, trial courts have broad discretion in admitting evidence, and their decisions will not be overturned absent an abuse of discretion and material prejudice to the defendant. *State v. Taylor*, 2d Dist. Montgomery No. 20944, 2006-Ohio-843, ¶ 58, citing *State v. Maurer*, 15 Ohio St.3d 239, 264–265, 473 N.E.2d 768 (1984).

**{¶ 37}** As previously stated, the trial court admitted the letters into evidence because they constituted the protected activity underlying Dr. Amesse's retaliation claim, making the letters an essential element supporting said claim against the appellants. Additionally, the trial court provided a limiting instruction in which it explicitly directed the jury *not* to consider the letters as proof that the appellants had violated the ADA.

**{¶ 38}** Additionally, the appellants argue that the letters were unduly prejudicial because Dr. Amesse did not have a good-faith belief that he had been treated unlawfully when he was ordered to submit to a fitness-for-duty examination. This argument is undermined by the record. After initially agreeing to undergo an examination, Dr. Amesse testified that he had "a lot of concerns and doubts" after having time to consider the appellants' request. After further consideration, Dr. Amesse informed the appellants that he refused to submit to the examination. It was also during this period that Dr. Amesse retained counsel in order to protect his rights. Immediately after retaining counsel, Dr. Amesse asked his attorney to send the September 9, 2011, letter in which

he asserted his rights under the ADA. On this record, Dr. Amesse's actions upon obtaining counsel and being suspended by the appellants clearly establish that he had a good-faith belief that his rights had been violated when he was ordered to submit to a psychological evaluation.

{¶ 39} Lastly, the appellants argue that the letters were overly prejudicial because they contained incorrect statements of law regarding the legality of requiring an employee to submit to a fitness-for-duty examination. A letter to an employer constitutes protected activity if it opposes unlawful activity with some specificity, as opposed to merely a "vague charge of discrimination." *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 Fed.Appx. 624, 631 (6th Cir.2013). Here, at Dr. Amesse's request, counsel sent letters on September 9, 2011, and October 4, 2011, in which he asserted that WSP's requirement that Dr. Amesse undergo a fitness-for-duty examination potentially violated the ADA which "makes it unlawful for a covered entity to require a medical examination of an employee." Furthermore, protection attaches if the manner of opposition is reasonable and is based on a reasonable and good faith belief that the challenged conduct is unlawful. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir.2000). The record establishes that Dr. Amesse had a good-faith belief that his rights had been violated by the appellants when they requested that he submit to the fitness-for-duty examination. Therefore, the fact that Dr. Amesse cited to the ADA in the letters rather than R.C. 4112.02(I) for his retaliation claim is not dispositive as long as he had a good faith belief that his rights had been violated when the letters were initially sent to the appellants. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312-13 (6th Cir.1989) (holding that "[a] person opposing an apparently discriminatory practice does not bear the entire risk that it is in

fact lawful; he or she must only have a good faith belief that the practice is unlawful"). Therefore, we find that the probative value of Pl.'s Exs. 29 and 36 substantially outweighs any danger of any prejudice to the appellants.

{¶ 40} The appellants' first assignment of error is overruled.

{¶ 41} Because they are interrelated, the appellants' second, third, and fourth assignments of error will be discussed together as follows:

{¶ 42} "THE JURY'S VERDICT IN FAVOR OF PLAINTIFF ON PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 43} "THE JURY'S VERDICTS IN FAVOR OF PLAINTIFF ON PLAINTIFF'S CLAIM FOR DISCRIMINATION ARE AGAINST THE MANIFEST OF THE EVIDENCE."

{¶ 44} "THE JURY'S VERDICTS IN FAVOR OF PLAINTIFF ON PLAINTIFF'S CLAIM FOR RETALIATION ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 45} In their second, third, and fourth assignments, the appellants contend that the jury's verdict in favor of Dr. Amesse with respect to his claims for breach of contract, discrimination, and retaliation are against the manifest weight of the evidence.

{¶ 46} The manifest weight standard of appellate review used in *Thompkins* applies in both civil and criminal cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17. Consequently, in civil cases, "[w]hen a [judgment] is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier

of fact 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the [judgment].' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 47}** This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97–CA–03, 1997 WL 691510 (Oct. 24, 1997).

**A. Breach of Contract**

**{¶ 48}** To prevail on his claim that WSP breached its contract with Dr. Amesse by suspending his pay from May of 2012 until April of 2013, Dr. Amesse bore the burden of establishing the following: 1) the existence of a binding contract or agreement; 2) that Dr. Amesse performed his contractual obligations; 3) that WSP failed to fulfill its contractual obligations without legal excuse; and 4) that Dr. Amesse suffered damages as a result of the breach. *Otstot v. Owens*, 2d Dist. Clark No. 2015–CA–57, 2016–Ohio–233, ¶ 10, citing *Auto Sale, L.L.C. v. Am. Auto Credit, L.L.C.*, 8th Dist. Cuyahoga No. 102438, 2015–Ohio–4763, ¶ 15.

**{¶ 49}** At trial, the only element in dispute was whether WSP breached its employment contract with Dr. Amesse. All parties agree that Dr. Amesse was

compensated pursuant to a Faculty Employment Agreement, complemented by an Amendment to Physician Employment Agreement and a Notice of Compensation. There is also no dispute that Dr. Amesse carried out his work duties pursuant to his employment contract from May 2012 until April of 2013 when he was terminated from WSP. Lastly, the record establishes that Dr. Amesse sustained financial damages when WSP refused to compensate him during that time period.

{¶ 50} The Faculty Employment Agreement states in pertinent part:

(C)(4) UMSA [WSP] shall provide Physician [Dr. Amesse], as compensation for Physician's employment and performance of the duties and responsibilities herein, such regular and additional compensation as Physician and the Chair of the SOM Department of primary appointment of which Physician is a member may from time to time agree. USMA shall pay to Physician such compensation in accordance with USMA's regular practices from time to time in effect for its physician employees.

{¶ 51} The Amendment to Physician Employment Agreement states in pertinent part:

2. USMA shall pay Physician based on internal department policy.

3. Except as provided herein, the Physician Employment Agreement between the parties shall remain in full force and effect.

{¶ 52} The Notice of Compensation executed by Dr. Amesse states as follows:

Combined with your USMA salary, *if any*, you may earn up to a maximum of Two hundred thousand dollars ($200,000) during any fiscal year ***.

{¶ 53} Based on the language in the employment contract and its addendums, the

appellants argue that they were entitled to withhold all of Dr. Amesse's salary from May of 2012 until April of 2013 in order to reimburse WSP for the monetary deficit accumulated during his suspension with respect to the fitness-for-duty examination. The appellants also rely on "internal departmental policy" within WSP's Department of Obstetrics and Gynecology which they argue supports their decision to withhold Dr. Amesse's entire salary for the relevant time period. However, the record establishes that the appellants failed to produce any documents which purported to set forth the internal policies or regular practices of WSP's gynecology department.

{¶ 54} Dr. Amesse testified that during his employment at WSP, he had never heard of another physician employee having his or her entire salary withheld because of a departmental deficit. Dr. Amesse further testified that he understood the regular practice of the gynecology department to be to guarantee eighty percent of his salary every fiscal year, and then determine the remaining twenty percent based upon profits and losses. The Faculty Employment Agreement states that Dr. Amesse's compensation would be determined by an agreement between himself and the department chairperson. Dr. Amesse testified that he never agreed to be paid $0.00 for his continued services. Significantly, neither Dr. Dunn, nor any other witness, could identify another physician employee whose entire salary was withheld to cover a department deficit.

{¶ 55} The appellants also argue that Dr. Amesse agreed to receive no salary by continuing to provide medical services for WSP after the unilateral arrangement became effective. However, the record establishes that Dr. Amesse vocally opposed the withholding of his salary. In fact, Dr. Amesse testified that every time he received a

paycheck with a zero balance, he sent a memorandum to Dr. Yaklic and Dr. Dunn in which he stated his ongoing disagreement with the withholding of his salary. Here, the jury quite reasonably could have credited the evidence adduced by Dr. Amesse which established that the appellants breached the employment agreement when they withheld his salary during the relevant period of time.

{¶ 56} The evidence adduced at trial also supported the jury's decision to award Dr. Amesse $109,996.00 for his breach of contract claim. Dr. Amesse testified that he earned approximately $111,000.00 from WSP in 2011, which equates to $9,250.00 per month. Dr. Amesse testified that his salary from WSP fluctuated slightly from year to year. Dr. Amesse also testified that WSP refused to compensate him from mid-May of 2012 until April 30, 2013, approximately eleven and one-half months. With the jury's award of $109,996.00 for eleven and one-half months, Dr. Amesse was essentially awarded $9,565.00 per month, only slightly more than the monthly wage he earned during 2011. Accordingly, we find that the jury's economic award to Dr. Amesse for his breach of contract claim is not against the manifest weight of the evidence.

## B. Discrimination

{¶ 57} In their third assignment, WSP and Dr. Dunn argue that the jury's verdict in favor of Dr. Amesse's discrimination claim was against the manifest weight of the evidence.

{¶ 58} The appellants first argue that no credible evidence was adduced at trial which supported Dr. Amesse's perceived disability claim because 1) requiring submission to a fitness-for-duty examination is not evidence that an employer perceives an employee

to be disabled; and 2) Dr. Dunn was only concerned with Dr. Amesse's alleged inappropriate behavior and *not* his cognitive functioning.

{¶ 59} To establish a prima facie case of perceived disability discrimination, an employee must show: (1) that he was perceived as disabled, (2) that the employer took an adverse employment action against him because of the perceived disability, and (3) that the employee, although perceived as disabled, can safely and substantially perform the essential functions of the job in question. *Ames v. Ohio Dept. of Rehab. & Corr.*, 2014-Ohio-4774, 23 N.E.3d 162, ¶ 26 (10th Dist.); *see also Allen v. Totes/Isotoner Corp.*, 123 Ohio St.3d 216, 2009-Ohio-4231, 915 N.E.2d 622, ¶ 47, citing *Hazlett v. Martin Chevrolet, Inc.*, 25 Ohio St.3d 279, 281, 496 N.E.2d 478 (1986). "Ohio disability discrimination law is similar to the Federal Americans with Disabilities Act ('ADA'), and therefore Ohio courts may seek guidance in the interpretation of the Ohio discrimination law from regulations and cases that interpret the ADA." *Ames* at ¶ 26. A disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual, [and includes] being regarded as having such an impairment." 42 U.S.C. 12102(1)(A)/(C). "Major life activities" include, inter alia, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. 12102(2)(A).

{¶ 60} If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Turner v. Shahed Ents.,* 10th Dist. Franklin No. 10AP–892, 2011-Ohio-4654, ¶ 14. If an employer meets its burden of production, a plaintiff must prove

by a preponderance of the evidence that the employer's reason was merely a pretext for unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The ultimate burden of persuasion always remains with the plaintiff. *Id.* at 256, 101 S.Ct. 1089. In order to show pretext, a plaintiff must show both that the reason was false, and that discrimination was the real reason. *Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, 837 N.E.2d 1169, ¶ 14; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

{¶ 61} In support of their argument that ordering a fitness-for-duty examination is not probative of whether WSP and Dr. Dunn perceived Dr. Amesse as being mentally impaired, the appellants cite two cases from the Tenth District Court of Appeals, to wit: *Ames v. Ohio Dept. of Rehab. & Corr.*, 2014-Ohio-4774, 23 N.E.3d 162 (10th Dist.), and *Dalton v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. Franklin No. 13AP-827, 2014-Ohio-2658. Upon review, we find both of the cases cited by the appellants to be distinguishable from the instant case.

{¶ 62} In *Ames*, a Senior Parole Officer with the Ohio Department of Rehabilitation and Correction ("ODRC"), was ordered to undergo an Independent Medical Examination (IME) after threatening one of her co-workers on Facebook. *Id.* at ¶ 4. ODRC ordered a second IME after one of the employee's former domestic partners applied for a protection order after the employee had allegedly held a gun to her head. *Id.* at ¶ 11. After the employee was terminated for threatening another co-worker on Yahoo Messenger while she was on medical leave pending the examination, the employee filed a complaint against the ODRC for perceived disability discrimination. *Id.* at ¶ 15-17. Ultimately, the court held that the ODRC's multiple requests for IME's were *not* evidence that the ODRC

perceived her as being mentally impaired. *Id.* at ¶ 32. The court specifically noted that "[t]he three IMEs were sought because ODRC believed that appellant had exhibited behavior that made her potentially dangerous or lethal in the workplace." *Id.* at ¶ 31

{¶ 63} In *Dalton*, the employee was an assistant psychologist for the ODRC who had recently been reinstated to his job after he was previously terminated for misusing the state's email system, engaging in political activity while on the job, and intimidating a witness. *Id.* at ¶ 4. Thereafter, the ODRC ordered the employee to undergo an IME because he was exhibiting extreme paranoia on the job, to wit: the employee 1) refused to accept a full psychologist position because he thought it would "make him a target" and the "front office would come after him;" 2) refused to speak on the phone during work hours because he thought it was tapped; 3) accused the ODRC of tampering with his email; 4) believed the prison warden was "out to get him;" and 5) believed that illegal drugs were going to be planted in his office. *Id.* at ¶ 7-9. As in *Ames*, the court found that the ODRC's request for an IME was not evidence that his employer perceived him as disabled. *Id.* at ¶ 40. Rather, the IME was ordered because the employee's extreme paranoia caused ODRC to have "significant concern that [the employee] may be unable to perform the essential functions of his current position as a Psychology Assistant or the essential functions of the position we will have to reclassify him to as a Psychologist." *Id.*

{¶ 64} Employers are prohibited from "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability ... unless such examination or inquiry is shown to be job-related and consistent with business necessity." *Kroll v. White Lake Ambulance Authority*, 691 F.3d 809, 815 (6th Cir.2012). An employer's request for a fitness-for-duty examination is job-related and consistent with business necessity when:

(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others. *Denman v. Davey Tree Expert Co.*, 266 Fed.Appx. 377, 379 (6th Cir. 2007).

**{¶ 65}** Unlike the employees in *Ames* and *Dalton*, Dr. Amesse adduced credible evidence that the fitness-for-duty examination ordered by the appellants in the instant case was not a business necessity. In *Dalton*, the employee was found to be unable to carry out the essential functions of his job as a psychologist because of his paranoia. Conversely, the record establishes that at no time during the relevant time period was Dr. Amesse unable to perform his duties as a medical professional. Additionally, unlike the employee in *Ames* who was considered a direct threat to her co-workers, the appellants failed to adduce any evidence that Dr. Amesse was any type of threat to himself or others.

**{¶ 66}** Significantly, Dr. Dunn testified that she was never concerned with his competency as a physician or his ability to do his job. We also note that even after Dr. Dunn suspended Dr. Amesse from treating patients at the WSP's private office, she still allowed him to continue treating patients at local hospitals and working with medical students and other staff in his role as a physician. From this evidence, the jury could conclude that the appellants failed to establish that the fitness-for-duty examination was legitimately job-related and consistent with business necessity.

**{¶ 67}** Additionally, Dr. Amesse adduced other evidence which could be construed as establishing that Dr. Dunn and WSP perceived him to have a mental impairment. Specifically, in a letter to Dr. Nizny, the psychiatrist who was asked to conduct Dr. Amesse's fitness-for-duty examination, WSP asked him to investigate whether Dr.

Amesse was "experiencing any Axis 1 problems" and whether there were "any non-Axis 1 problems that [were] contributing to these complaints." At trial, Dr. Nizny testified that Axis 1 refers to a category of serious psychiatric conditions and disorders including but not limited to schizophrenia, depression, dementia, and substance abuse disorders. WSP's inquiries regarding Axis 1 psychiatric disorders in the letter to Dr. Nizny constitute evidence which could be construed as establishing that the appellants perceived Dr. Amesse to be suffering from some type of mental impairment.

{¶ 68} We also note that on November 15, 2011, Dr. Nizny sent WSP a letter in which he stated that after conducting his examination, he believed that Dr. Amesse suffered from "an Axis 1 condition of Anxiety Disorder." Pl.'s Ex. 42. Dr. Nizny also stated that "Dr. Amesse who wants again to practice effectively, is in need of psychiatric treatment to assist him to practice effectively." *Id.* Thereafter, Dr. Amesse was allowed to return to practicing at WSP, but Dr. Dunn required him to attend psychiatric counseling for at least six months and provide documentation to her that the counseling sessions were taking place. All of this evidence taken together is sufficient to establish that WSP and Dr. Dunn perceived Dr. Amesse to be suffering from a mental impairment.

{¶ 69} In support of their argument that they terminated Dr. Amesse for a legitimate, non-discriminatory reason, the appellants rely on the report of Dr. Bruce Carr, the physician they hired to evaluate a selection of Dr. Amesse's patient charts. It is apparent from the record, however, that Dr. Amesse adduced evidence which questioned the credibility and impartiality of Dr. Carr's report. As previously stated, Dr. Carr's report was highly critical of every aspect of Dr. Amesse's practice of medicine.

{¶ 70} However, Dr. Dunn testified that WSP had never hired a consultant to

perform an outside evaluation of one of its physicians, and there was no policy in place regarding how and which of Dr. Amesse's patient charts would be chosen for Dr. Carr to review. Furthermore, in evaluating the patient charts, Dr. Carr had no contact at all with Dr. Amesse. Nor was Dr. Amesse given an opportunity to explain his professional medical decisions recorded in the patient charts. Dr. Amesse also presented his own expert witness, Dr. Tamer Yalcinkaya, who examined all of Dr. Amesse's patient charts. From the patient charts that he examined, Dr. Yalcinkaya testified that he found Dr. Amesse's performance to be well within the applicable standard of medical care. Therefore, it was not unreasonable for the jury to have discounted Dr. Carr's report and found that WSP's stated reasons for terminating Dr. Amesse were merely a pretext for discriminating against him because they believed him to be suffering from a serious mental disorder.

{¶ 71} Upon review, we conclude that the jury's verdict finding WSP and Dr. Dunn liable for Dr. Amesse's discrimination claim was not against the manifest weight of the evidence. Dr. Amesse adduced evidence at trial which, if believed, established that WSP and Dr. Dunn terminated his employment because they perceived him as disabled.

## C. Retaliation

{¶ 72} In their fourth assignment, the appellants argue that the jury's verdict finding them liable for retaliation for modifying Dr. Amesse's salary and/or terminating his employment was against the manifest weight of the evidence. Specifically, the appellants contend that 1) Dr. Amesse did not engage in protected activity; 2) the salary modification could not have been causally connected to his protected activity because he

was suspended prior to his attorney sending WSP notice of its potential violations of the ADA; and 3) WSP was justified in modifying Dr. Amesse's salary.

{¶ 73} Initially, we note that the appellants repeat many of the same arguments that we disposed of in our analysis of his first assignment, wherein we found that the letters sent by Dr. Amesse's counsel to WSP on September 9, 2011, and October 4, 2011, constituted the protected activity which formed the basis for his retaliation claim and were therefore properly admitted into evidence by the trial court. Moreover, we have already found that the evidence adduced at trial establishes that Dr. Amesse's actions after being suspended by the appellants clearly establish that he had a good-faith belief that his rights had been violated when he was ordered to submit to a psychological evaluation. Finally, we have also found that the evidence supports the jury's verdict that the appellants breached Dr. Amesse's employment agreement when they unilaterally decided to withhold his entire salary from May of 2012 until April of 2013 when his employment was terminated.

{¶ 74} The appellants, however, present two additional arguments regarding the temporal relationship regarding when the letters were sent by Dr. Amesse's counsel to WSP and the date, approximately eight months later, that the decision was made to withhold Dr. Amesse's entire salary. First, the appellants argue that the May of 2012 salary modification was related to the interim suspension imposed prior to WSP's receipt of the letters. Furthermore, the appellants argue that the fact that Dr. Amesse's salary was withheld in May of 2012, approximately eight months after the alleged protected activity letter was sent to WSP, "weighs against any finding of a causal connection." In support of their argument, the appellants rely on *Godsey-Marshall v. Phillipsburg*, 2d Dist.

Montgomery No. 23687, 2010-Ohio-2266, a case in which an employee claimed that she had been sexually harassed by her employer.

Here, Godsey-Marshall presents no evidence from which it would be reasonable to infer a causal relationship between the activity and the actions. We observe first that the evidence strongly suggests that the adverse actions Godsey-Marshall cites were taken because of the general reorganization of the fire department that Evans undertook with the Village Council's blessing. Also, no permissible inference of causality arises from the temporal proximity. Godsey-Marshall complained to the Village Council in 2004 but the adverse action she cites did not occur until 2007-*roughly three years later*. The temporal proximity is much too great to permit a reasonable inference that the two are causally connected. Therefore, Godsey-Marshall fails to establish the fourth prima-facie element.

*Id.* at ¶ 30.

**{¶ 75}** Dr. Amesse's entire salary was withheld only eight months after his counsel sent the letters. In *Godsey-Marshall*, the adverse employment action occurred *three years after* the employee made her initial complaint. Moreover, in *Godsey-Marshall*, we found that the evidence strongly suggested that the adverse actions the employee complained of were taken because of a general reorganization of the fire department, not because she complained of being sexually harassed. *Id.* at 30. Here, the jury was free to reject the appellants' argument that Dr. Amesse's salary withholding had already been decided upon when he was first suspended on August 29, 2011. Significantly, no evidence was adduced which established that any other physician employed by WSP,

with the exception of Dr. Amesse, had ever been subject to having his or her entire salary withheld because of a departmental deficit. Additionally, the temporal proximity between the sending of the letters and the salary withholding is close enough in time to permit a reasonable inference that the two are causally connected. Therefore, we conclude that the jury's verdict finding the appellant's liable for retaliation is not against the manifest weight of the evidence.

{¶ 76} The appellants' second, third, and fourth assignments of error are overruled.

{¶ 77} Because they are interrelated, the appellant's fifth, sixth, and seventh assignments of error will be discussed together as follows:

{¶ 78} "THE TRIAL COURT ERRED WHEN IT OVERRULED, ON MAY 10, 2016, THE MOTION FOR DIRECTED VERDICTS OF DEFENDANTS WRIGHT STATE PHYSICIANS, INC., DR. MARGARET DUNN, AND JEROME YAKLIC, ON PLAINTIFF'S CLAIMS FOR BREACH OF CONTRACT, DISCRIMINATION, AND RETALIATION."

{¶ 79} "THE TRIAL COURT ERRED WHEN IT OVERRULED, ON NOVEMBER 3, 2016, THE MOTION FOR A JUDGMENT NOTHWITHSTANDING THE VERDICT OF DEFENDANTS WRIGHT STATE PHYSICIANS, INC. AND DR. MARGARET DUNN ON PLAINTIFF'S CLAIM FOR DISCRIMINATION."

{¶ 80} "THE TRIAL COURT ERRED WHEN IT OVERRULED, ON NOVEMBER 3, 2016, THE MOTION FOR A JUDGMENT NOTHWITHSTANDING THE VERDICT OF DEFENDANTS WRIGHT STATE PHYSICIANS, INC., DR. MARGARET DUNN, AND DR. JEROME YAKLIC, ON PLAINTIFF'S RETALIATION CLAIM."

{¶ 81} The test applied by a trial court in ruling on a motion for JNOV is the same test to be applied on a motion for a directed verdict. *Eastley v. Volkman*, 132 Ohio St.3d

328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 25; *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976). In reviewing a motion for JNOV, the evidence "must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied." *Osler v. Lorain*, 28 Ohio St.3d 345, 347, 504 N.E.2d 19 (1986), citing *Posin* at 275, 344 N.E.2d 334. "Neither the weight of the evidence nor the credibility of the witnesses is proper consideration for the trial court." *Smith v. Superior Prod., LLC*, 2014-Ohio-1961, 13 N.E.3d 664, ¶ 11 (10th Dist.), citing *Posin* at 275, 344 N.E.2d 334. Thus, "[a] motion for judgment notwithstanding the verdict is used to determine only one issue: whether the evidence is totally insufficient to support the verdict." *Harper v. Lefkowitz*, 10th Dist. Franklin No. 09AP-1090, 2010-Ohio-6527, ¶ 8. A ruling on a motion for JNOV is a question of law, reviewed de novo on appeal. *Eastley* at ¶ 25 (stating that in reviewing such motions, "the court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward"); *Smith*.

{¶ 82} A motion for JNOV is governed by Civ.R. 50(B), which provides:

Whether or not a motion to direct a verdict has been made or overruled and not later than twenty-eight days after entry of judgment, a party may serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion; or if a verdict was not returned such party, within twenty-eight days after the jury has been discharged, may serve a motion for judgment in accordance with the party's motion. A motion for a new trial

may be joined with this motion, or a new trial may be prayed for in the alternative.

Unless otherwise provided by local rule or by order of the court, arguments in response to the motion shall be served within fourteen days after service of the motion, and a movant's reply may be served within seven days after service of the response to the motion.

If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence. If no verdict was returned the court may direct the entry of judgment or may order a new trial.

{¶ 83} Having already found that the jury's verdicts in favor of Dr. Amesse's claims for breach of contract, discrimination, and retaliation are not against the manifest weight of the evidence, we therefore hold as a matter of law that the trial court did not err when it overruled the appellants' motion for directed verdicts and their motion for judgment notwithstanding the verdict (JNOV).

{¶ 84} The appellants' fifth, sixth, and seventh assignments of error are overruled.

{¶ 85} The appellants' eighth and final assignment of error is as follows:

{¶ 86} "THE TRIAL COURT ERRED WHEN IT OVERRULED THE MOTION FOR LEAVE TO AMEND THE ANSWER OF DEFENDANTS WRIGHT STATE PHYSICIANS, INC., DR. MARGARET DUNN, AND DR. JEROME YAKLIC TO ASSERT THE AFFIRMATIVE DEFENSE AND INTRODUCE AFTER-ACQUIRED EVIDENCE

RELEVANT TO THE DECISION TO TERMINATE DR. AMESSE."

{¶ 87} In their final assignment, the appellants contend that the trial court erred when it denied their motion to amend their answer, made during trial, to include an additional affirmative defense utilizing after-acquired evidence.

{¶ 88} Civ.R. 15(A) provides:

A party may amend its pleading once as a matter of course within twenty-eight days after serving it or, if the pleading is one to which a responsive pleading is required within twenty-eight days after service of a responsive pleading or twenty-eight days after service of a motion under Civ.R. 12(B), (E), or (F), whichever is earlier. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court shall freely give leave when justice so requires. * * *

{¶ 89} "A motion for leave to amend should be granted absent a finding of bad faith, undue delay or undue prejudice to the opposing party." *Hoover v. Sumlin*, 12 Ohio St.3d 1, 6, 465 N.E.2d 377 (1984). Despite the liberal policy in granting motions to amend, the appellate review of a trial court's decision regarding a motion to amend consists of determining whether the trial judge's decision was an abuse of discretion, not whether it was the same decision we might have made. *Han v. Univ. of Dayton*, 2015-Ohio-346, 28 N.E.3d 547, ¶ 57 (2d Dist.), citing *Wilmington Steel Prods., Inc. v. Cleveland Electric Illuminating Co.*, 60 Ohio St.3d 120, 122, 573 N.E.2d 622 (1991).

{¶ 90} In the instant case, the after-acquired evidence which formed the basis for the new affirmative defense consisted of approximately 200 text messages allegedly sent between Dr. Amesse and Cindy Gnau. It is undisputed, however, that, counsel for WSP

received the text messages at issue through discovery on or about April 14, 2014. The appellants, however, did not raise their after-acquired evidence defense until after the trial had commenced in May of 2016, more than two years later. In denying the appellants' motion to amend their answer, the trial court stated as follows:

> And so the Court finds that after-acquired evidence is an affirmative defense that could have, should have been pled well before the trial since these [text messages] came to the attention of the Defense, I believe in 2014, and the failure to have timely pled it constitutes a waiver of the defense.

{¶ 91} Upon review, we conclude that the trial court did not abuse its discretion when it denied the appellants' motion for leave to amend their answer to include the after-acquired evidence defense. The appellants had the text messages in their possession for over two years prior to the trial in this matter. We note that the appellants did not provide a rationale for its failure to properly assert this affirmative defense during the two years it had the evidence before the trial began. The appellants' failure to properly assert the defense prevented Dr. Amesse from conducting any discovery with respect to the affirmative defense. More importantly, had the trial court granted the appellants' motion to amend its answer, Dr. Amesse would have been forced to modify his strategy in the middle of the trial in order to account for the new affirmative defense, thereby causing him undue prejudice. Therefore, we find that the trial court did not abuse its discretion when it denied the appellants' motion to amend its answer.

{¶ 92} The appellants' eighth and final assignment of error is overruled.

{¶ 93} All of the appellants' assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.

Copies mailed to:

Jonathan Hollingsworth
Marc D. Mezibov
Susan L. Butler
Hon. Dennis J. Langer