[Cite as *Hoke v. Miami Valley Hosp.*, 2020-Ohio-3387.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| JACQUELINE L. HOKE, et al. | : | |
| | : | |
| Plaintiffs-Appellants | : | Appellate Case No. 28462 |
| | : | |
| v. | : | Trial Court Case No. 2017-CV-283 |
| | : | |
| MIAMI VALLEY HOSPITAL, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of June, 2020.

. . . . . . . . . . .

DWIGHT D. BRANNON, Atty. Reg. No. 0021657, KEVIN A. BOWMAN, Atty. Reg. No. 0068223, and MATTHEW C. SCHULTZ, Atty. Reg. No. 0080142, 130 West Second Street, Suite 900, Dayton, Ohio 45402
        Attorneys for Plaintiffs-Appellants

NEIL F. FREUND, Atty. Reg. No. 0012183, and SHANNON K. BOCKELMAN, Atty. Reg. No. 0082590, One South Main Street, Suite 1800, Dayton, Ohio 45402
        Attorneys for Defendant-Appellee, Miami Valley Hospital

JOHN B. WELCH, Atty. Reg. No. 0055337, 580 Lincoln Park Boulevard, Suite 222, Dayton, Ohio 45429, and GREGORY B. FOLIANO, Atty. Reg. No. 0047239, 2075 Marble Cliff Office Park, Columbus, Ohio 43215
        Attorneys for Defendant-Appellee, Debra Miller, M.D.

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Jaqueline and James Hoke appeal from an adverse jury verdict on a medical-malpractice action they filed against appellees Debra Miller, M.D., and Miami Valley Hospital. They also appeal from the trial court's denial of a motion for judgment notwithstanding the verdict and a motion for a new trial.

{¶ 2} The Hokes advance three assignments of error. First, they contend the trial court erred in denying their motion for a new trial under Civ.R. 59. Second, they claim the trial court erred in denying the motion for judgment notwithstanding the verdict. Third, they assert that the jury's verdict was against the manifest weight of the evidence.

**General Background**

{¶ 3} In November 2012, on a referral from her gynecologist, Jacqueline Hoke was seen by Debra Miller, M.D., a surgeon board-certified in obstetrics and gynecology and in the sub-specialty of female pelvic medicine and reconstructive surgery. Hoke had previously had surgery for a hysterectomy and for anterior vaginal repair of a cystocele in 2009. Symptoms returned, and she complained of urinary stress incontinence. Dr. Miller diagnosed vaginal vault prolapse (apex of the vagina, where the uterus used to be, falling down into the vaginal vault), a cystocele (the bladder dropping into the vaginal vault), rectocele (the rectum bulging into the vaginal vault), and urinary stress incontinence. Conservative treatment, i.e. a pessary, did not improve the symptoms. In the order of the described diagnoses, Dr. Miller recommended a robotic sacrocolpopexy to repair the vaginal prolapse and cystocele, a rectocele repair, and a transobturator tape procedure. A sacrocolpopexy is a procedure where the vagina is suspended with an inverted y-shaped mesh, the tail of which is stitched to and suspended from the longitudinal ligament located at the sacral promontory. The vaginal suspension was to correct the prolapse and

the cystocele. The combination surgery would also include two non-robotic procedures, a vaginal approach rectocele repair and a TOT, a transobturator tape procedure, also performed by a vaginal approach, which involved the placement of a sling-type material underneath the urethra for support to relieve stress incontinence.

{¶ 4} The April 1, 2013 surgery began with Dr. Miller robotically performing the sacrocolpopexy procedure. The surgical team included a certified surgical tech, Andrew Huffman, and a circulating nurse, Shannon Webb. As Dr. Miller was placing the second of two stitches to hold the tail of the mesh to the longitudinal ligament at the sacral promontory, she encountered bleeding. She tied the stitch down to see if what she described in her operation note as "copious venous bleeding" would resolve. It did not. She then applied pressure on the bleeding location with the robotic arm and applied Floseal, a coagulant. When direct pressure was removed after about five minutes, there was still "brisk bleeding." (T. 2797.) Dr. Miller then applied GelFoam, a second coagulant, and with pressure the bleeding stopped. (*Id.*)

{¶ 5} With the robotic arm locked in position to continue applying pressure, Dr. Miller instructed certified tech Huffman to monitor the bleeding site. Dr. Miller then proceeded to complete the non-robotic vaginal approach portions of the surgery, which took "about 30 or 40 minutes." (T. 2798.) Jacqueline Hoke's vital signs remained stable throughout.

{¶ 6} Upon returning to the site of the bleeding, when pressure was let up "it was still bleeding." (T. 2801.) Dr. Miller then asked for a vascular surgeon. No one was available, so she consulted with Dr. Minia Hellan, an available robotically-trained surgical oncologist. Dr. Hellan sat at the robotic console, dissected part of the area, and concluded

that the bleeding could not be robotically repaired. A vascular surgeon, Dr. Garietta Falls, was located, and an abdominal opening was started for Dr. Falls.   Dr. Falls, after further sharp and blunt dissection, found holes in the iliac vein and repaired them.

{¶ 7} Subsequent to the surgery, Mrs. Hoke developed deep vein thrombosis (DVT) and a post-thrombotic syndrome. She related this led to debilitating and painful consequences. She testified she is no longer able to work.

### The Litigation

{¶ 8} Jacqueline Hoke and her husband filed a personal injury complaint, raising medical negligence claims against Dr. Miller and Miami Valley Hospital by and though its employees, for injuries and damages resulting from the care and treatment of Mrs. Hoke. Among other things, and involving other parties not involved in this appeal, the Hokes included a claim for lack of informed consent against Dr. Miller. The trial court granted Dr. Miller's motion for a directed verdict on the informed-consent claim at the close of all the evidence. (T. 2904.)

{¶ 9} On September 5, 2018 the Hokes filed a "motion for joint and several liability for all defendants and all their employees * * *." That motion appears to contend that Dr. Miller, Miami Valley Hospital and its employees, and Dr. Garietta Falls, if found liable, should be held jointly liable. Dr. Miller was not an employee of the hospital at the time of the surgery. Dr. Falls was not a named defendant, and there was no expert testimony criticizing her involvement. The motion was overruled by entry filed September 10, 2018.

{¶ 10} The trial began on September 11, 2018. On September 7, 2018, the Hokes had filed a motion in limine to prohibit the defendants from soliciting expert opinions from one another's expert witnesses. By entry filed the morning of trial, the court overruled this

motion.   The Hokes filed a motion in limine to prevent the defendants from using terms such as "complication of surgery" and "clinical" or "professional" judgment. The trial court had not ruled on the motion before trial. During voir dire, the Hokes raised the issue again, and after considerable argument at sidebar the court allowed use of the terminology. (T. 166-171.) At different intervals throughout the trial, the Hokes brought up the "complication of surgery" issue again, and the court overruled those objections.

{¶ 11} When the initial round of voir dire questioning was completed, the court convened a conference in chambers for the exercise of jury challenges. The Hokes contended that they should have six peremptory challenges in that each defendant would have three according to rule. After considerable argument, the court ruled that the plaintiffs would have three peremptory challenges and each defendant would have three peremptory challenges.

{¶ 12} On Thursday afternoon in the third week of the trial, September 27, 2018, the case was submitted to the jury. One of the jurors was unable to be present on the next day, Friday, September 28th. The court instructed the alternate jurors not to discuss the case with anyone in the event they might have to be called back. The court then instructed the remaining jurors:

As far as the Court is concerned we can go late.   And I don't want the regular eight, don't rush it.   If you can't handle it deliberately at a due pace, but don't rush just because -- there's no deadline on when you have to finish.   If [juror 8], you don't get to decide it today, we can call on one of the alternates to replace juror number 8, all right.   That's the way we're going to handle it.   We're going to -- don't rush.   Deliberate as you

normally would, as if you had no pressure for a deadline, okay?

(T. 3057).

{¶ 13} The jury returned general verdicts for the defendants. For an interrogatory questioning whether they found Dr. Miller to be negligent, they answered "no." For an interrogatory questioning whether they found Miami Valley Hospital to be negligent, they answered "no." The court entered judgment consistent with the verdicts.

{¶ 14} The Hokes subsequently filed a motion for a new trial and a motion for judgment notwithstanding the verdicts. The issues raised in those motions are substantially similar to those raised in assignments of error 1 and 2 on appeal. The trial court overruled these motions. The Hokes appealed.

### The Liability Experts

{¶ 15} In addition to the various other experts, the Hokes called three physicians who testified that Dr. Miller's performance was below the standard of care. Dr. Earle M. Pescatore, Jr. is a urogynecologist and a gynecologist practicing in Iowa. Dr. Pescatore testified that it was below the standard of care to fail to identify anatomical "landmarks" and to have damaged the iliac vein in this surgery. He also testified that it was below the standard of care to move to the non-robotic portion of the surgery without resolving the bleeding and to keep pressure on the bleeding area for an hour. With regard to the hospital employees, Dr. Pescatore's brief testimony was that the nursing staff "should have said something," and that "the circulating nurse or the tech" should have gotten a vascular surgeon about an hour earlier than they did.

{¶ 16} On cross-examination, Dr. Pascatore admitted that throughout the surgery Mrs. Hoke never became unstable. When asked whether "the original procedure, doing

this robotically" was a problem, he answered: "I don't have an issue with that." (T. 625.) When asked whether the robotic tech or circulating nurse should have told Dr. Miller not to proceed to the vaginal part of the surgery, Dr. Pascatore responded: "I think they should have told her they were uncomfortable with the situation * * *. They should have advocated for the patient." (T. 608.)

{¶ 17} The Hokes' second liability witness was Dr. Steven McCarus, an obstetrician gynecologist surgeon who practices in Orlando, Florida. Preliminarily, he distinguished a surgical "complication" from a breach of the standard of care. He stated: "[A]nd there's times where you can perform an operation and have a complication and not breach the standard of care. And there are times where you can perform an operation, and have [a] complication and breach of standard of care." (T. 1109.) Dr. McCarus then explained: "[When] you identify where you should place [the stitch], and you place it and you get into a bleeder[ ] [i]f there's disease or some other circumstance that would be related to the injury, then that's not neglectful. That's known to occur with surgery. But if you don't identify things, and you place something in the wrong place, and get a complication, that's neglectful." (T. 1135.)

{¶ 18} Dr. McCarus also testified that it was a breach of the standard of care in the described procedure to lacerate the iliac vein or to suture the mesh into the left iliac vein. Likewise, it was a breach to leave the bleeding surgical area for an hour with pressure on it while going to the other part of the procedures. Finally, he testified that the robotic team and circulating nurse "need to recognize when there's a major intraoperative misadventure, like a major bleed." He stated that it would be below the standard of care for them not to recognize a major bleed and react to it by asking the surgeon if they

needed help or by obtaining help for them.

{¶ 19} On cross-examination, Dr. McCarus admitted he had "no doubt [Dr. Miller] knows how to use the robot [,] * * * she's got credentials to do robotic surgery * * *. I have no issue with the robot." (T. 1170.) He also testified that in his opinion Dr. Miller adequately obtained informed consent from Mrs. Hoke for the surgery.

{¶ 20} On direct examination, Dr. McManus had been critical of Dr. Miller for not properly identifying structures in the vicinity of the sacral promontory and for failing to stay right of midline when placing the suture into the longitudinal ligament at the sacrum. He distinguished the proper location for the stitch as "one to one and a half centimeters" (T.1134) from the sacral promontory. He said "[t]hat's where you put the suture, not at the sacral promontory." (T. 1133.) In response to this contention, counsel for Dr. Miller cross-examined Dr. McCarus about an article in the Journal of Robotic Surgery. Dr. McCarus acknowledged the publication as a "reasonable" and "reliable" journal. (T. 1190.) The article said "the tail of the graft is then sutured to the sacral promontory." (*Id.*) The witness also was questioned about an article in the Journal of Pelvic Medicine and Reconstructive Surgery. Dr. McCarus stated: "I have never seen this article." (T. 1191.). Over plaintiffs' objection, Dr. McManus was questioned about the article's indication that "[t]wo separate stitches were used to anchor the mesh to the anterior longitudinal ligament at the sacral promontory" (T. 1192.) Dr. McManus was also questioned regarding an article entitled "Robotic Assisted Laparoscopic Mesh Sacrocolpopexy" written by Dr. Hundley, Miami Valley Hospital's expert. There is no indication Dr. McCarus was familiar with the publication or recognized it as authoritative. Over plaintiffs' objection, Dr. McCarus was questioned about a passage in the article stating that "the mesh is sutured

at the promontory using two to four sutures." (T. 1193.) Dr. Miller argues on appeal that the Journal of Pelvic Medicine and Reconstructive Surgery was established as reliable because expert witness Dr. Rosenblatt is an editor of that publication. We have not been directed to and have been unable to locate anywhere in the record where Dr. Rosenblatt said he is an editor of this specific publication.

{¶ 21} The Hokes also called Dr. Mary Dupont, a surgeon board-certified in both urology and female pelvic medicine and reconstructive surgery, who practices in Maryland. Dr. Dupont testified it is below the standard of care to puncture the iliac vein several times during the described surgery. In regard to the "complication of surgery" issue, she said "just because something can be a known potential complication doesn't mean that it's an acceptable complication." Dr. Dupont testified it was below the standard of care to continue on to the remainder of the surgery instead of immediately addressing the "life threatening" bleeding.

{¶ 22} On cross-examination, Dr. Dupont, like the other plaintiffs' liability experts, testified she had no criticism that the injury occurred during a "robotic approach" surgery. We further note that none of the Hokes' experts questioned Dr. Miller's credentials or testified the robot should not have been used because it was somehow dangerous.

{¶ 23} Three physicians testified as liability experts for the defendants. Dr. Andrew Hundley, called by Miami Valley Hospital, is a surgeon board-certified in both general obstetrics and gynecology and in female pelvic medicine reconstructive surgery. He practices at Ohio State University and performs laparoscopic, open, and robotic surgeries. He testified that robotic tech Huffman met the standard of care of a certified surgical assistant and there was no reason for him to go "up the chain of command" and

to have gotten someone else to come into the operating room. He also testified that circulating nurse Webb met the standard of care in her treatment of Mrs. Hoke and there was no reason for her to have left the operating room to get help before the time when Dr. Hellan, and later Dr. Falls, came in.

{¶ 24} On cross-examination by Dr. Miller's attorney, Dr. Hundley agreed that "injury to the common iliac is a known complication of a sacrocolpopexy." (T. 1767.) He gave the opinion that placing the second suture and obtaining bleeding was not a deviation from the standard of care.  And he opined that Dr. Miller met the standard of care in the performance of the surgery.

{¶ 25} Dr. Peter Rosenblatt was called as an expert by Dr. Miller. Dr. Rosenblatt is a surgeon who is board-certified in obstetrics and gynecology and also in female pelvic medicine and reconstructive surgery practicing in Massachusetts. After reviewing the facts and circumstances of the case, he opined that Dr. Miller met the standard of care in her care and treatment of Mrs. Hoke. He said that in a laparoscopic or robotic sacrocolpopexy, injury to the iliac vein is a risk and complication that can occur within the standard of care.

{¶ 26} On cross-examination by the attorney for Miami Valley Hospital, Dr. Rosenblatt testified that there was no reason for nurse Webb or surgical tech Huffman to go "up the chain of command." He believed that everything Dr. Miller had done was within the standard of care, so there would be no reason to go over the head of this physician.

{¶ 27} Certified surgical tech Huffman testified about his training and experience and about his participation in the surgery.   He said he was familiar with the standard of care as it applied to certified surgical assistants. He concluded that he met that standard

of care as it related to Mrs. Hoke's surgery.

## Analysis

## I.

{¶ 28} In their first assignment of error, the Hokes challenge the trial court's denial of their new-trial motion. They advance 17 arguments, raising issues related to the following grounds set forth in Civ.R. 59:

(1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;

(2) Misconduct of the jury or prevailing party;

(3) Accident or surprise which ordinary prudence could not have guarded against;

* * *

(6) The judgment is not sustained by the weight of the evidence * * *;

(7) The judgment is contrary to law;

* * *

(9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.

{¶ 29} Our standard of review for a trial court's ruling on a new-trial motion under Civ.R. 59(A) depends on the basis of the motion. We review a trial court's ruling on motions brought under Civ.R. 59(A)(1)-(6) and (8) for an abuse of discretion, whereas rulings on motions brought under Civ.R. 59(A)(7) and (9) are reviewed de novo. *Harrison v. Horizon Women's Healthcare, LLC*, 2d Dist. Montgomery No. 28154, 2019-Ohio-3528, ¶ 11. Thus, the standard of review in the present case depends on which of the Hokes'

17 arguments we are addressing. For purposes of clarity, we will address each of those arguments separately.[1]

### 1. Challenge to Standard of Review

{¶ 30} The Hokes first dispute the proper application of the abuse-of-discretion standard. Following a lengthy exposition of the standard and its history, the Hokes assert that this court's application of the terms "unconscionable, arbitrary, and unreasonable" in many of its decisions has been "not well reasoned, but simply an attempt to avoid overturning or sustaining the decisions, clarifying the law, or simply rocking the boat." (Appellants' Brief at 9.) The Hokes argue that this court's historical application of the abuse-of-discretion standard "is really no standard at all, but simply invites the appellate court to do what it wishes based upon its overall view of the case, without in-depth analysis." (*Id.*) They assert that our failure to reconsider our application of the abuse-of-discretion standard "will spell the doom of medical malpractice cases and destruction of the standard of care." (*Id.*)

{¶ 31} Notwithstanding the Hokes' dire concerns, we will adhere to our well-established application of the abuse-of-discretion standard, which involves determining whether a trial court's decision is unreasonable, arbitrary, or unconscionable. The issue in most cases is whether the trial court acted unreasonably. "A decision is unreasonable

---

[1] We note too that the Hokes raise additional arguments in their reply briefs. For example, in their reply brief directed toward appellee Dr. Miller the Hokes challenge a jury instruction on the issue of proximate cause and argue judicial misconduct by the trial court. (Appellants' March 2, 2020 Reply Brief Directed to Appellee Debra A. Miller, M.D., at 17-18.) These issues were not raised in the Hokes' opening appellate brief. It is well settled that a party may not raise new issues in a reply brief. *See, e.g.*, *Ostendorf v. Montgomery Cty. Bd. of Commrs.*, 2d Dist. Montgomery Nos. 20257 and 20261, 2004-Ohio-4520, ¶ 29. Therefore, we will not consider any such issues.

if there is no sound reasoning process that would support that decision." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). We are unconvinced that faithful application of this standard will "spell doom" in medical malpractice cases or any other type of cases.

## 2. Equalizing Peremptory Challenges

{¶ 32} The Hokes contend the trial court erred in allowing them only three peremptory challenges during jury selection while giving MVH and Miller three peremptory challenges each. The Hokes assert that MVH and Miller had a joint interest in the outcome of the case. That being so, the Hokes argue that MVH and Miller should have been awarded three peremptory challenges to share and that giving them six effectively enabled the defense to pick the jury.

{¶ 33} The Hokes' argument implicates Civ.R. 47(C), which provides: "In addition to challenges for cause provided by law, each party peremptorily may challenge three prospective jurors. If the interests of multiple litigants are essentially the same, 'each party' shall mean 'each side.' " In *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 512 N.E.2d 640 (1987), the Ohio Supreme Court cited favorably to case law from this court providing that "'litigants who have identical interests or defenses are to be considered as one party and therefore only collectively entitled to the number of challenges allowed to one party by the statute.' " *Id.* at 125, quoting *Chakeres v. Merchants & Mechanics Fed. S. & L. Assn.*, 117 Ohio App. 351, 192 N.E.2d 323 (2d Dist.1962). In *LeFort*, the Ohio Supreme Court held that multiple defendants were not to be treated as one party where they filed separate replies and defenses, were represented by separate counsel, and pursued defenses that did not stand or fall together. *Id.*

{¶ 34} Here MVH and Miller had separate counsel and filed separate motions. They also had separate experts and separate defenses, which did not entirely rise and fall together. Among other differences, MVH's defense was concerned with the standard of care required for a nurse and a certified surgical technician who were in the operating room with Miller. Conversely, Miller's defense concerned in part her own surgical technique and decision-making. Even if the interests and defenses of MVH and Miller overlapped in some areas, the trial court did not abuse its discretion in treating them as separate parties for purposes of allocating peremptory challenges. We note too that Miller only exercised one of her three peremptory challenges. Therefore, the defense collectively exercised four peremptory challenges to the Hokes' three. We are unpersuaded that this small disparity effectively enabled MVH and Miller to pick the jury, as the Hokes assert.

### 3. Complication-of-Surgery Defense

{¶ 35} The Hokes contend the trial court erred in allowing testimony about the injury to Mrs. Hoke's vein being a "recognized complication" or a "complication of surgery." They argue that this testimony misled the jury into believing tort liability does not attach to such "complications" even when a doctor fails to meet the applicable standard of care. The Hokes reason that the testimony suggested the damage to Mrs. Hoke's iliac vein necessarily was a "natural consequence of the procedure" and, therefore, not the result of negligence. (Appellants' Brief at 14-16.)

{¶ 36} In connection with the foregoing argument, the Hokes assert that expert testimony about the injury being a "complication of surgery" was unnecessary because it was within the common knowledge of the average lay person. They further assert that

such testimony was inadmissible because it expressed a conclusion of law that Dr. Miller was not negligent. (*Id.* at 16-18.)

{¶ 37} The Hokes also argue that this court's opinion in *Witzmann v. Adam*, 2d Dist. Montgomery No. 23352, 2011-Ohio-379, supports reversal of the judgment in favor of Dr. Miller and MVH. (Appellants' Brief at 19.) At the same time, however, they argue that *Witzmann* is "poorly reasoned" and should be overruled. (*Id.*) They assert that *Witzmann* is so clearly wrong that stare decisis does not justify upholding it.

{¶ 38} The Hokes additionally contend that repeated use of words like "complication of surgery" at trial constituted structural error. Finally, they suggest that those words shifted the burden of proof for an affirmative defense, eliminated any consideration of testimony about the standard of care, removed the issue of causation from the jury, omitted the "reasonable probability" standard, and enabled the defense "illegally to use complications of surgery, etc., as an affirmative defense." (Appellants' Brief at 24-25.)

{¶ 39} Upon review, we find no error in the trial court allowing testimony about the injury at issue being a "recognized complication" or a "complication of surgery." As a preliminary matter, there was no real dispute about that fact. The injury occurred during surgery, and no one suggested that it was an expected or intended consequence. Therefore, the bleeding Mrs. Hoke experienced fairly could be characterized as a "complication" of her surgery. Moreover, the Hokes' own experts agreed that the injury at issue was a known complication or risk of the surgery. (*See, e.g.,* T. 538-539, 1109, 1135, 1185-1187.) That being so, we see nothing inappropriate about the injury to Mrs. Hoke's vein being referred to as a "recognized complication" or a "complication of surgery."

{¶ 40} We also see no likelihood that the jury was misled by testimony about Mrs. Hoke's injury being a recognized complication of surgery. We are unconvinced that such testimony caused the jury to believe the defendants could not be liable for Mrs. Hoke's injury even if they failed to meet the standard of care. Expert witnesses for both sides made clear that a "complication of surgery" may occur with a surgeon operating *within or outside* of the applicable standard of care. For example, the Hokes' own expert Dr. McCarus explained: "[A]nd there's times where you can perform an operation and have a complication and not breach the standard of care.  And there are times where you can perform an operation, and have [a] complication and breach of standard of care." (T. 1109.) Dr. McCarus then elaborated: "[When] you identify where you should place [the stitch], and you place it and you get into a bleeder[ ] [i]f there's disease or some other circumstance that would be related to the injury, then that's not neglectful. That's known to occur with surgery. But if you don't identify things, and you place something in the wrong place, and get a complication, that's neglectful." (T. 1135.)

{¶ 41} The crucial question then, which was made clear to the jury, was whether Mrs. Hoke's injury was caused by something Dr. Miller did that was outside the standard of care, or whether the injury occurred despite the fact that Dr. Miller did everything correctly and met the standard of care. The defense argued and presented evidence that the defendants met the standard of care despite the fact that the iliac vein was injured. The Hokes argued and presented evidence to the contrary. After hearing the conflicting evidence, the jury rendered a verdict finding the defendants were not negligent, indicating that they did not violate the applicable standard of care notwithstanding the injury that occurred.

**{¶ 42}** We are equally unpersuaded that expert testimony was unnecessary and inappropriate as to whether Mrs. Hoke's injury was a recognized complication of surgery that could occur within or outside the standard of care. Contrary to the Hokes' argument, we are not convinced that this was a matter within the common knowledge of a lay person. Nor do we believe that the experts who testified improperly gave a conclusion of law when they discussed Mrs. Hoke's injury being a complication of surgery. The jury reasonably could have found that the defendants were not negligent based on expert testimony that the injury to Mrs. Hoke was a complication of surgery that occurred even though the defendants met the standard of care. Expert testimony that the defendants met the standard of care was not the same as testifying as to a conclusion of law. Indeed, medical malpractice cases require evidence about whether a defendant doctor did or did not satisfy the standard of care. *Stuck v. Miami Valley Hospital*, 2020-Ohio-129, 141 N.E.3d 290, ¶ 24-25 (2d Dist.).

**{¶ 43}** As for this court's opinion in *Witzmann*, 2d Dist. Montgomery No. 23352, 2011-Ohio-379, we find no basis for overruling it. In *Witzmann*, the defendant doctor performed thyroid surgery and injured a nerve that controlled the plaintiff's left vocal cord. As in the present case, there was no real dispute that the defendant injured the nerve. The only question was whether he injured the nerve despite meeting the applicable standard of care, or whether a deviation from the standard of care caused the injury to the nerve. As in the present case, both sides presented competing expert testimony as to whether the injury had occurred with the doctor operating within or outside of the standard of care. *Id.* at ¶ 7, 32-33. The defendant's experts opined that the defendant properly had identified the nerve and had followed it as far as it could be seen. The experts

explained, however, that there is an area in which the nerve cannot be seen. They expressed their belief that this is where the injury occurred, despite the defendant doctor doing everything correctly.

{¶ 44} On appeal, this court reasoned:

The dispute concerns whether [defendant doctor] Adam adequately protected the recurrent laryngeal nerve. It was Witzmann's experts' opinion that he did not. They believed that when there are no complications a surgeon of ordinary skill, care, and diligence can always avoid cutting the nerve. Conversely, [defense expert] Dr. Cummings cited medical studies showing that even in the absence of complications severe injury to the nerve occurs in a small number of cases. He described how a surgeon might injure the nerve in the area where it is most vulnerable near the suspensory ligament, even though the surgeon had identified it and traced its path. Dr. Cummings therefore opined that a surgeon of ordinary skill, care, and diligence could severely injure the nerve even though his conduct conformed to the standard of care. It was Dr. Cummings's opinion that this is what happened during Witzmann's thyroidectomy.

Dr. Cummings's testimony alone is substantial, probative evidence that supports Adam's defense that he did not breach the standard of care and was not negligent.

*Id.* at ¶ 36-37.

{¶ 45} Later in *Witzmann*, this court stated:

Adam admits that he severely injured Witzmann's recurrent laryngeal

nerve. He admits that this injury caused damage to her voice, for which she sought damages. The idea of a "recognized complication" refers to the expert testimony that it is recognized that severe non-negligent injury to that nerve occurs in a small percentage of cases. Causation is not the issue here, negligence is. * * *

*Id.* at ¶ 66.

**{¶ 46}** This court also rejected an argument in *Witzmann* that "complication of surgery" was an affirmative defense on which the defendant bore the burden of proof:

* * * Adam's defense of "complication of surgery" was not an affirmative defense. It was a defensive matter, to be sure, but not in the nature of a confession and avoidance. Adam did not admit that Witzmann had a claim for medical malpractice or that he was negligent.

Rather, Adam's argument, and the evidence supporting it, rebuts the negligence element of Witzmann's medical-malpractice claim. Witzmann had the burden to prove that Adam negligently injured her nerve. Adam contended that, while he injured her nerve, he had conformed to the relevant standard of care. Witzmann's injury, he contended, was simply one of the risks (potential complications) associated with the procedure. The defense that the injury was the result of a "complication of surgery," then, simply suggests that Adam was not negligent.

*Id.* at ¶ 69-70.

**{¶ 47}** Even more so than in *Witzmann*, the record in the present case makes clear that a risk or "complication" of surgery may occur within or outside the applicable standard

of care. Therefore, we reject the Hokes' argument that the phrase "complication of surgery" was used at trial as a synonym for "not negligent." The trial court certainly did not hold this view. It made its understanding of the issue clear, stating at one point:

> Now, we know, we got through this complication of surgery, and all our evidence so far is there can be complications; some related to negligence, some not related to negligence. So I think that it's—those words are not an automatic impermissible-type testimony.
>
> * * *
>
> But—so and the witnesses make that very clear, the distinctions— and I don't think there's danger of confusing the jury or misleading the jury by using those terms. In this profession, those terms are used regularly. So I don't think it's a problem. * * *

(T. 1621-1622.)

{¶ 48} Based on our review of the record, we agree with the trial court's assessment. We do not believe that the jury was misled by testimony about Mrs. Hoke's injury being a "recognized complication" or a "complication of surgery." Nor do we see anything else in *Witzmann* justifying its overruling. Because we see no error in the references to complications of surgery at trial, we also conclude that such references did not constitute structural error.

{¶ 49} On the authority of *Witzmann*, we likewise reject any argument about "complications of surgery" being an affirmative defense. Nor did references to complications of surgery eliminate the jury's consideration of testimony about the standard of care, remove the issue of causation from the jury, or nullify the "reasonable

probability" standard. To the extent that the Hokes very briefly touch upon these issues, we find them to be without merit.

## 4. Evidence of Past Medical Conditions

{¶ 50} The Hokes contend MVH and Miller improperly introduced evidence at trial regarding Jacqueline Hoke's past medical conditions and treatments. The Hokes argue that this evidence should have been excluded because the defense failed to link her prior complaints with her current condition and the pain she experienced following Miller's surgery. Absent any evidence of causation linking her pre-existing problems with her current medical condition, the Hokes assert that the trial court erred in allowing evidence of Jacqueline Hoke's pas medical conditions and treatments.

{¶ 51} Upon review, we find this argument to be moot. As set forth above, the jury entered a defense verdict, finding that MVH and Miller were not negligent. Elsewhere in this opinion, we have upheld that determination. Therefore, we have no need to address any issue related to causation evidence and damages.

## 5. Use of Combined Defenses

{¶ 52} The Hokes argue that the "[t]he Defendants combined the issues of assumption of risk, complication of surgery, informed consent, and risk of surgery, all individually inadmissible, but collectively a bombshell of prejudicial error." (Appellants' Brief at 28.) In support, they cite one transcript page and contend defense expert Dr. Rosenblatt "testified that the cutting of the iliac vein by Dr. Miller was not negligent simply because of the combination of these 'defenses,' which operate to create a bar for recovery where negligence was clearly presented." (*Id.* at 29, citing T. 2297.) According to the Hokes, Dr. Rosenblatt's testimony "presented an alternative explanation of causation not

expressed as a probability, but simply as something that *could* happen." (*Id.*)

{¶ 53} Having reviewed the cited transcript page, we find the Hokes' argument to be unpersuasive. Near the beginning of his testimony on direct examination, Dr. Rosenblatt was asked whether Dr. Miller "met the standard of care in her care and treatment of Mrs. Hoke[.]" On the cited transcript page, Dr. Rosenblatt responded that Dr. Miller "did meet the standard of care." (T. 2297.) In the following pages, he opined that Mrs. Hoke's injury was a known complication or risk of the surgery that can occur despite a surgeon meeting the applicable standard of care—which is what he found to have happened in Mrs. Hoke's case. On the cited page, Dr. Rosenblatt also remarked that such known complications or risks are "why we have an informed consent process[.]" (*Id.* at 2297-2298.) The Hokes have not demonstrated any improper combining of defenses that resulted in "a bombshell of prejudicial error."

### 6. Expert Testimony in Violation of *Daubert* and Evid.R. 702(C)

{¶ 54} The Hokes challenge defense expert Howard Caston's opinion testimony that Jacqueline Hoke suffered no loss of earning capacity. They assert that Caston improperly disregarded, overlooked, and ignored evidence to the contrary. They also argue that Caston's opinion about Jacqueline Hoke not being disabled was inadmissible under Evid.R. 702(C) and *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). These issues go to damages and are moot in light of our determination herein that the jury's verdict finding no negligence was supported by the evidence.

### 7. Exclusion of Expert Report Finding Disability

{¶ 55} The Hokes contend the trial court erred in excluding an expert report from

Dr. Mark Reynolds regarding Jacqueline Hoke being disabled. This issue too is moot because it pertains to damages.

### 8. Use of Social Medial Pictures and Videos

{¶ 56} The Hokes assert that the trial court erred in allowing the defense to introduce social medial pictures and videos. They contend the pictures and videos did not accurately depict Jacqueline Hoke's condition and, therefore, "were misleading, unfairly prejudicial, and ultimately redundant." (Appellants' Brief at 35-36.) As a result, the Hokes claim the pictures and videos should have been excluded under Evid.R. 403(A).

{¶ 57} Upon review, we note that the social media evidence was relevant to the issue of Jacqueline Hoke's damages, which is moot in light of our affirmance of the jury's defense verdict on the issue of negligence.

### 9. Cross-Examination of Co-Defendants' Witnesses

{¶ 58} The Hokes argue that the trial court erred in permitting MVH and Dr. Miller to ask leading questions, as upon cross-examination, of each other's expert and lay witnesses. They reference 13 specific portions of the trial transcript in support of this argument.

{¶ 59} On the first cited page, counsel for MVH asked a question of MVH's own witness, Dr. Hundley. The trial court overruled an objection that the question was leading. The trial court was correct. The question was not leading. Counsel asked: "Is there an increased risk of bleeding when you are working specifically in the pelvis?" (T. 1636.) Although this question called for a "yes" or "no" answer, such binary questions are not leading unless they suggest which answer is correct. *State v. Moore*, 2019-Ohio-1671, 135 N.E.3d 1114, ¶ 52 (2d Dist.).

{¶ 60} In the second cited example, counsel for MVH again was questioning MVH's own witness, Dr. Hundley. Again, the question (whether Dr. Miller had met the applicable standard of care by doing certain things) was not leading. It called for a "yes" or "no" answer but did not suggest the answer. (T. at 1664-1666.)

{¶ 61} In the third cited example, counsel for MVH still was questioning the hospital's own witness, not a co-defendant's witness. Counsel prefaced her inquiry with a statement: "Doctor, I know you advise your patients of the risk of DVTs and blood clots because you did tell the ladies and gentlemen of the jury that that is a risk of surgery." (*Id.* at 1678.) Counsel then followed up with questions that were not leading. (*Id.* at 1678-1679.) We see nothing improper.

{¶ 62} The fourth cited example does involve Dr. Miller's counsel questioning MVH's witness, Dr. Hundley. On the cited page, counsel did ask a leading question about Dr. Miller not thinking pressure on the vein would lead to DVT. (*Id.* at 1775.) The trial court overruled a "leading" objection to this question. Immediately after the question, Dr. Hundley simply confirmed his awareness that Dr. Miller had made that comment. (*Id.*) "The allowing or refusing of leading questions in the examination of a witness must very largely be subject to the control of the court, in the exercise of a sound discretion." *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 204, 423 N.E.2d 831 (1981). This is true even when counsel for one defendant cross-examines a potentially "friendly" co-defendant's witness. *Id.* We see no abuse of discretion in the cited example, and we have no reason to believe Dr. Hundley would have answered the innocuous question differently if counsel had asked it in a non-leading way.

{¶ 63} The fifth cited example once again involved MVH directly examining its own

witness. (Tr. 1830.) It did not involve cross-examination by one defendant of another defendant's witness, which is the basis for the assignment of error. And again the question at issue ("And did you learn that she was not working?") was not leading. It called for a "yes" or "no" answer without suggesting the answer.

{¶ 64} In the sixth cited example, the trial court correctly overruled an objection to a question that was not leading, while *sustaining* an objection to a question that it found was impermissibly leading. (T. 1885.)

{¶ 65} In the seventh cited example, the trial court overruled a "leading" objection but disallowed the question due to a lack of relevance. (T. 1895.) We fail to see what conceivable argument the Hokes could have with respect to a disallowed question.

{¶ 66} The eighth cited example involved the direct examination of Dr. Miller's expert, Dr. Rosenblatt, by Dr. Miller's own counsel. It did not involve cross-examination of a friendly expert by an aligned co-defendant, which is what the assignment of error alleges. In any event, the challenged question was not leading. Counsel sought clarification, asking: "When you talk to patients about known risks, Dr. Rosenblatt, are you talking about complications that occur even though the surgeon does the surgery appropriately and within the standard of care?" (T. 2299-2300.) Again, this question did not suggest the answer.

{¶ 67} The ninth cited example also involved the direct examination of Dr. Miller's own expert by Dr. Miller's counsel. And the question at issue there was not leading. Counsel asked whether a particular injury could occur within the standard of care. (T. 2304.) This question did not suggest the answer.

{¶ 68} The tenth cited example again involved the direct examination of Dr. Miller's

own expert by Dr. Miller's counsel. Although the Hokes' counsel objected multiple times on the cited page, the first question was not leading. Counsel asked: "I mean, is it your opinion that the pressure in this case, even if it was held for one hour, was—would harm this patient at all?" (T. 2397.) The question simply asked for the doctor's opinion. He either did or did not hold such an opinion. In two other instances, counsel paraphrased the doctor's earlier testimony as a preface for a question that was not leading. (Tr. 2397-2398.)

{¶ 69} In the eleventh cited example, the Hokes' counsel raised one "leading" objection, and the trial court *sustained* the objection. (T. 2592.)

{¶ 70} In the twelfth cited example, the Hokes do identify a leading question to which an objection was overruled. (T. 2612.) The objection occurred when counsel for Dr. Miller was questioning MVH certified surgical assistant Andrew Huffman. When discussing the bleeding that occurred in this case, counsel asked: "And you didn't know which specific vessel the bleeding was coming from?" The Hokes' attorney objected on the basis that the question was leading. The trial court overruled the objection. Huffman responded: "That is correct." In our opinion, the trial court did not abuse its discretion in allowing this question and answer. Huffman already had testified earlier that he initially did not know which vessel was causing the bleeding. (*See, e.g.*, T. 2545-2546.) Therefore, it is reasonable to infer that counsel would have gotten the same answer if counsel had inquired, in a non-leading way, whether Huffman knew which specific vessel was causing the bleeding.

{¶ 71} In the last cited example, the Hokes' counsel objected to one question on the basis that it was leading, and the trial court *sustained* the objection. (T. 2823.) We

again fail to see how this raises any conceivable issue for appeal. The Hokes' counsel also objected generally when Dr. Miller was asked whether she had an opinion as to how the injury to the vein occurred. (*Id.*). But this question was not leading.

{¶ 72} As set forth above, the basis for the Hokes' argument is that Dr. Miller and MVH repeatedly were allowed to use leading questions to cross-examine each other's "friendly" witnesses. The Hokes assert that the interests of Dr. Miller and MVH were not sufficiently adverse to allow this to occur. Having examined each of the 13 examples cited by the Hokes, however, we have found very few instances in which counsel for one of the defendants asked leading questions of the other defendant's witness. The Hokes have failed to establish the existence of repetitive "friendly" crosses. On those occasions where "friendly" cross-examination did occur, we believe the trial court acted within its discretion in allowing the questioning.

## 10. Use of Employment Records

{¶ 73} The Hokes contend the trial court erred in allowing MVH and Miller to use Jacqueline Hoke's employment records on cross-examination and as direct evidence at trial. But evidence pertaining to Jacqueline Hokes' employment was relevant to the issue of damages, which is now moot. Therefore, we need not address the use of employment records by MVH and Miller.

## 11. Cross-Examination with Learned Treatises

{¶ 74} The Hokes challenge the cross-examination of their expert witnesses with journal articles without establishing a foundation as to reliability. They characterize the articles as "used utterly without any foundation as to their reliability." (Appellants' Brief at 43.) The only citation in the Hokes' appellate brief involves two journals: the Journal of

Robotic Surgery and the Journal of Pelvic Medicine and Reconstructive Surgery. (*Id.* at 42, citing T. 1189-1191.) In the cited portion of the transcript, the Hokes' expert Dr. McCarus agreed on cross-examination that the Journal of Robotic Surgery was a "reasonable" and reliable" journal with which he was familiar. (T. at 1189-1190.). "According to Evid.R. 803(18), an expert witness need only testify that a learned treatise is a reliable authority for a court to admit statements from that treatise." *Bradley v. Ohio Dept. of Transp.*, 10th Dist. Franklin Nos. 11AP-409, 11AP-410, 2012-Ohio-451, ¶ 23. In light of Dr. McCarus' own testimony, we conclude that the reliability of the Journal of Robotic Surgery was established adequately.

{¶ 75} With regard to the Journal of Pelvic Medicine and Reconstructive Surgery, Dr. McCarus did not indicate any familiarity with it. (T. 1191-1192.) We note that Dr. McCarus also was cross-examined with reference to an article (from an apparently unidentified journal) entitled "Robotic Assisted Laparoscopic Mesh Sacrocolpopexy." (*Id.* at 1192-1193.) The record does not indicate whether Dr. McCarus was familiar with the journal in which this article appeared or whether he believed the journal was reliable. Appellee Dr. Miller maintains that another expert in the case, Dr. Rosenblatt, established a foundation as to the reliability of the Journal of Pelvic Medicine and Reconstructive Surgery based on his position as an editor of that journal. We have not been directed to where and we have been unable to locate anywhere in the record where Dr. Rosenblatt said he is an editor of this journal.

{¶ 76} But even if the record lacks an adequate foundation for the reliability of the Journal of Pelvic Medicine and Reconstructive Surgery or the unidentified journal in which the last article referenced above appeared, we find no basis for reversal. All three of the

articles discussed above addressed the proper place to suture the mesh used in Mrs. Hoke's surgery, and all three articles said essentially the same thing. For that reason, any potential error with regard to cross-examining Dr. McCarus with the second and third articles was harmless. We also find any error in the trial court's handling of the learned-treatise issue harmless beyond a reasonable doubt in the context of the trial as a whole.

## 12. Examination of Witnesses Regarding Miller's Credentials

{¶ 77} The Hokes argue that the trial court erred in prohibiting examination of witnesses regarding whether Dr. Miller was properly trained to perform surgery using the DaVinci robotic surgical system. In support, they cite three portions of the trial transcript. In the first, the trial court sustained a defense objection to a comment about Dr. Miller not being sufficiently trained on the robotic system. (T. 406.) In the second, the trial court overruled a defense objection and allowed the Hokes' counsel to ask the question at issue. (T. 1114-1116.) In the third, the trial court ruled in the Hokes' favor and refused to give the jury an interrogatory proposed by Dr. Miller concerning the specific nature of her alleged negligence.

{¶ 78} We fail to see how the Hokes were prejudiced by the foregoing rulings, two of which were favorable to them. With regard to the trial court's refusing to allow the Hokes' counsel to comment on Dr. Miller's allegedly inadequate training on the robotic system, we note that the Hokes' own expert testified that she was qualified. In particular, Dr. McCarus, testified: "I have no doubt that [Dr. Miller] knows how to use the robot. She's got credentials to do robotic surgery." (T. 1170.) He also testified that he had "no issue" with Dr. Miller using the robot in the present case. He agreed that it was a "good" and "appropriate" choice. (T. 1171.) Finally, he agreed that the robot was a "good tool" and an

"approved medical device that doctors use to help patients." (*Id.*) In light of this testimony, we see no issue with regard to Dr. Miller's training and credentials.

### 13. Evidence Regarding Safety of the DaVinci Surgical System

{¶ 79} The Hokes challenge the trial court's refusal to permit the introduction of evidence regarding the safety record of the DaVinci robotic surgical system. In support, they make only one reference to the record. The cited reference, however, involves the trial court *overruling* Dr. Miller's counsel's objection to the Hokes' counsel referencing medical literature in opening statements. (T. 427-428.) In any event, we see no issue regarding the safety of the DaVinci surgical system. As noted above, the Hokes' own expert, Dr. McCarus, characterized the robot as a "good" and "appropriate" choice and an "approved medical device." Another one of the Hokes' experts, Dr. Pescatore, testified that the robot was "one of the acceptable ways" to perform the procedure at issue. (T. 625.) Therefore, we see no basis for reversal with regard to the safety of the DaVinci surgical system.

### 14. Misconduct in Closing Argument, Witness Questioning, and Voir Dire

{¶ 80} Although the heading of this argument references misconduct in "closing argument," "witness questioning," and "voir dire," the Hokes' opening brief contains only one citation to the record and one example of misconduct. Specifically, they contend that "[o]ver objection, [c]ounsel for Dr. Miller were permitted to address personal attacks against Plaintiffs' counsel and engage in other inflammatory argument." (Appellants' Brief at 44.) The four cited transcript pages reflect that the trial court overruled an objection when counsel for Dr. Miller referred to the Hokes' case as being full of "distractions" and "irrelevant evidence." (T. 2995.) The trial court also overruled an objection when Dr.

Miller's counsel stated: "Mr. Brannon got up here and he talked about, he said it's not an issue, it's not an issue, ladies and gentlemen. Informed consent is not an issue. That's what he said." (*Id.*) The trial court then overruled an objection when Dr. Miller's counsel added: "Yet, in this case, he questioned about it constantly." (*Id.* at 2995-2996.) The trial court subsequently sustained three objections by the Hokes' counsel related to argument from Dr. Miller's counsel pertaining to informed consent. (*Id.* at 2996.) The trial court then overruled an objection to argument from Dr. Miller's counsel about the Hokes' counsel excessively questioning Dr. Miller's training and experience with robotic surgery. (*Id.* at 2996-2997.) Dr. Miller's counsel characterized these issues as "distractions" because even the Hokes' own expert agreed that she was qualified to do robotic surgery. (*Id.* at 2997.) On the final cited transcript page, counsel for Dr. Miller argued what the evidence showed about Mrs. Hoke's injury and prognosis and about whether a known complication of the surgery was injury to the iliac vein. (*Id.* at 3004.)

{¶ 81} Having reviewed the cited transcript pages, we see no abuse of discretion in the trial court's rulings on the objections and no plain error arising from any argument to which the Hokes did not object. We find no "personal attacks" or other non-specified "inflammatory argument" supporting reversal.

### 15. Third-Party Causation

{¶ 82} The Hokes contend the trial court erred in allowing the defense to argue third-party liability on the part of Dr. Garietta Falls. More specifically, they assert that the defense improperly presented testimony regarding Dr. Falls causing injury to Jacqueline Hoke's iliac vein. They argue that this attempt by the defense "to blame Dr. Falls clearly misled the jury into speculating that other doctors may have contributed to Ms. Hoke's

injury." (Appellants' Brief at 45.) The Hokes' sole citation to the record fails to support their argument.

{¶ 83} In the cited portion of the trial transcript, Dr. Miller's counsel addressed the jury during closing arguments. Dr. Miller's counsel asserted that the Hokes' experts had agreed the act of holding pressure on Jacqueline Hoke's bleeding vein for an hour did not violate the standard of care and did not cause injury. (T. 2998-2999.) In connection with this argument, counsel told the jury that the Hokes' own experts agreed there was no evidence Dr. Miller even knew it was a vein that was bleeding. (T. 3000.) Dr. Miller's counsel also argued that Dr. Falls herself admitted not knowing where the bleeding was coming from until she "dissected it out." (*Id.*) Dr. Miller's counsel then stated: "And everyone agreed that if it—that the most common spot during the surgery for bleeding is the sacral plexus. And everyone agreed that for the sacral plexus, you hold pressure." (*Id.*). We see nothing in the foregoing argument constituting an attempt to impose third-party liability on Dr. Falls. To the contrary, Dr. Miller's counsel simply argued that under the circumstances of this case holding pressure on Mrs. Hoke's bleeding vein did not violate the standard of care or cause injury. We find nothing improper about this argument.

### 16. Joint-and-Several Liability

{¶ 84} The Hokes contend the trial court erred in overruling their motion for joint-and-several liability. Because the jury found Dr. Miller and the employees of MVH not negligent, however, there was no basis for imposing joint-and-several liability. Therefore, we see no error.

### 17. Time for Jury Deliberations

{¶ 85} The Hokes assert that the trial court placed time pressure on the jury and

hurried it into reaching a verdict. This argument concerns juror number eight's inability to deliberate on Friday, September 28, 2018 due to a prior obligation. The Hokes expressed concern that the jury might rush to reach a verdict prior to that time. As a result, they asked the trial court to release juror number eight and to seat an alternate juror in juror number eight's place. The trial court denied the request. It decided that if the jury failed to reach a verdict before juror number eight had to leave, it then "could call on one of the alternates to replace juror number [eight]." (T. 3057-3058.) In conjunction with this decision, the trial court explicitly instructed the jury *not* to hurry its deliberations. It stated:

As far as the Court is concerned we can go late. And I don't want the regular eight, don't rush it. If you can't handle it deliberately at a due pace, but don't rush just because—there's no deadline on when you have to finish. If * * * you don't get to decide it today, we can call on one of the alternates to replace juror number 8, all right. That's the way we're going to handle it. We're going to—don't rush. Deliberate as you normally would, as if you had no pressure for a deadline, okay?

(T. 3057.)

{¶ 86} Upon review, we see no abuse of discretion in the trial court's handling of the situation. The trial court placed no time limit on deliberations, and it instructed the jury not to rush to a decision. We see nothing unreasonable about the trial court's instruction, which the jury is presumed to have followed.

{¶ 87} Having rejected each of the Hokes' 17 arguments, we overrule their first assignment of error.

**II.**

{¶ 88} In their second assignment of error, the Hokes challenge the trial court's denial of their motion for judgment notwithstanding the verdict. Their entire substantive argument is as follows:

In the context of a medical malpractice action, where the evidence is such that reasonable minds could only conclude that the defendants fell below the standard of care, as is the case here, JNOV in favor of the plaintiff is proper.

The trial court, further, committed reversible error by failing to rule, upon a motion for directed verdict, that all of the injuries at issue, physical, psychiatric, and psychological, were a proximate result of the robotic surgery that pierced Mrs. Hoke's iliac vein.

(Citations omitted.) (Appellants' Brief at 49-50.)

{¶ 89} We find the Hokes' argument to be unpersuasive. Based on the evidence presented, reasonable minds could find—and did find—that the defendants met the applicable standard of care. As set forth more fully above, multiple expert witnesses testified in favor of Dr. Miller, MVH, and hospital employees Huffman and Webb regarding their performance and their satisfaction of the applicable standard of care. Construing the evidence in a light most favorable to the defense, there certainly was sufficient evidence for the trial court to submit the matter to the jury.

{¶ 90} As for whether Mrs. Hoke's injuries were proximately caused by the robotic surgery, the proximate-cause issue is not relevant to this appeal because the jury found for the defendants on the negligence issue. *Ernes v. Northeast Ohio Eye Surgeons, Inc.*, 11th Dist. Portage No. 2005-P-0043, 2006-Ohio-1456, ¶ 18 (recognizing in a medical

malpractice case that "without a breach of the standard of care, it is elemental negligence law that the issue of proximate cause is moot"). The second assignment of error is overruled.

### III.

**{¶ 91}** In their third assignment of error, the Hokes contend the jury's verdict was against the manifest weight of the evidence. Their entire argument is as follows:

> In this case, Defendants' own expert acknowledged that sewing the uterine mesh to the iliac vein was outside the standard of care, in the absence of any extenuating factor. (Tr. Vol. 17, p. 2359) No expert testified that any such extenuating factor existed. None of the testifying experts acknowledged ever causing a similar injury. The evidence plainly showed extensive injury to the iliac vein with multiple perforations, and the notion that anyone other than Dr. Miller caused such injury was the sheerest speculation. (Tr. Vol. 6, p. 1552) The jury clearly lost its way in its determination that there was no negligence in this case. Plaintiff Jacqueline Hoke has suffered a permanent and disabling injury. Multiple experts concluded this, and crucially, no expert testified otherwise. She has been left without remedy. A new trial is the only possible remedy for this injustice.

> Furthermore, as set forth above, and in Plaintiffs' prior motions, there was prejudicial error in allowing inadmissible evidence and other violations of the rules of evidence and civil procedure. In order to protect the record, Plaintiff's counsel made the decision to object, rather than waive Plaintiff's objections. There is evidence that, in doing so, Plaintiff's counsel's conduct

disaffected the jury and further led to the manifestly unjust result which left Jacqueline Hoke without remedy. Stranded on the horns of such a dilemma, Plaintiff's counsel objected, further impairing plaintiff's case before the jury, but fortunately preserving it for review under the law here and now before this Court. A new trial offers the only solution to rectify the unjust result, with exclusion of improper evidence, argument and questioning of witnesses by Defendants, to remove the above-improper evidence from any newly-composed jury, a jury that will not be so misled as to disregard the manifest weight of the evidence.

(Appellants' Brief at 50-51.)

{¶ 92} In civil and criminal cases alike, a judgment will be reversed as being against the manifest weight of the evidence only in an exceptional case in which the evidence weighs heavily against the judgment. *Amesse v. Wright State Physicians, Inc.*, 2018-Ohio-416, 105 N.E.3d 612, ¶ 46 (2d Dist.) (noting that the same manifest-weight standard of review applies in civil and criminal cases). Here we conclude that the weight of the evidence was not contrary to the jury's verdict.

{¶ 93} In the first paragraph quoted above, the Hokes contend the defense's own expert admitted that Dr. Miller violated the applicable standard of care. On the cited transcript page, Dr. Rosenblatt agreed with the Hokes' counsel that to justify suturing mesh through the vein "you would have to assume there's some kind of anatomical difference * * * in Jackie Hoke." (T. 2359.) Dr. Rosenblatt also agreed that "it isn't within the standard of care to suture the mesh directly to the vein." Elsewhere in his testimony, however, he unambiguously opined that Dr. Miller met the applicable standard of care

with respect to Mrs. Hoke. (T. 2297.) He explained that injury to the iliac vein is a risk or complication that can occur even though a surgeon meets the standard of care and that a surgeon doing Dr. Miller's procedure correctly might injure the iliac vein. (T. 2304, 2311.) This is sometimes due to normal anatomical variations between people and the fact that the procedure is performed in an area of the body with "a lot going on in there" and "in a very small space." (T. 2304-2306, 2311.) Having examined Dr. Rosenblatt's testimony more broadly, we believe the specific citation upon which the Hokes rely fails to establish that the jury's verdict was against the manifest weight of the evidence. In reaching this conclusion, we note too that Dr. Rosenblatt was not the only expert to opine that Dr. Miller operated within the applicable standard of care.

{¶ 94} In the second paragraph quoted above, the Hokes argue that their attorney alienated the jury by making repeated objections at trial. They suggest that the objections were necessary, however, due to opposing counsel's numerous violations of the rules of evidence and civil procedure. They have not identified any particular violations in their third assignment of error, and we have rejected almost all of the specific arguments the Hokes have raised elsewhere in their appellate brief. Regardless, every attorney must make a calculated decision in a jury trial regarding when and how often to object. We are unpersuaded that the Hokes' counsel's choices regarding objecting at trial rendered the jury's verdict against the manifest weight of the evidence. The third assignment of error is overruled.

## Conclusion

{¶ 95} Having overruled the Hokes' assignments of error, we affirm the judgment of the Montgomery County Common Pleas Court.

. . . . . . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.


Copies sent to:

Dwight D. Brannon
Kevin A. Bowman
Matthew C. Schultz
Neil F. Freund
Shannon K. Bockelman
John B. Welch
Gregory B. Foliano
Todd Smith
Hon. Timothy N. O'Connell